## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **ROC NATION LLC**, a Delaware Limited Liability Company, | Case No.: 19-cv-554 |
| **Plaintiff**, | **COMPLAINT** |
| -against- | **(JURY TRIAL DEMANDED)** |
| **HCC INTERNATIONAL INSURANCE COMPANY, PLC**, a United Kingdom-Domiciled Insurance Company, |  |
| **Defendant**. |  |

Plaintiff Roc Nation LLC ("Roc Nation"), by and through its attorneys Reed Smith LLP, as and for its complaint against Defendant HCC International Insurance Co., PLC ("HCCI"), respectfully alleges as follows:

### NATURE OF THIS ACTION

1.      Plaintiff Roc Nation brings this breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief lawsuit against HCCI because, among other things:

a.      HCCI misrepresented to Plaintiff, during the procurement process of the Subject Policy (defined below), that Plaintiff was applying for and purchasing from HCCI standard Key Person insurance policies covering the life of Jordan Feldstein, the founder and former Chief Executive Officer of Career Artist Management LLC ("CAM");

b.      HCCI has wrongfully denied insurance coverage for Plaintiff's clearly covered loss following the untimely death of Mr. Feldstein based on multiple incorrect

interpretations of various provisions of the policy at issue and, to date, has failed to pay in excess of 90% of Plaintiff's claim;

      c.    HCCI has failed to properly and timely investigate the claim and it has failed to conclude its investigation in a timely manner as required under the policy;

      d.    Because the policies drafted and issued by HCCI are so shoddily drafted, they contains multiple ambiguities each of which must be strictly construed against HCCI and resolved in favor of coverage for Plaintiff's claim;

      e.    HCCI has wrongfully denied insurance coverage for this clearly covered loss under the policy at issue by falsely claiming that (i) HCCI did not have sufficient information to timely conclude its investigation of the claim as it is required to do under the policy; and (ii) Plaintiff has failed to cooperate (which is not true) in the investigation of its claim and that, as a result, HCCI was justified in denying this claim outright based upon this purported lack of cooperation (such a claim is totally baseless);

      f.    HCCI now improperly seeks to reform the standardized form policy language that <u>it</u> alone originally crafted -- now asserting that it meant to refer to the "**Insured Person**" rather than the "**Insured**" in a clause contained within the definition of the term "**Direct Ascertained Net Loss**".

      g.    HCCI has also wrongfully denied insurance coverage for this clearly covered loss under the policy by falsely claiming that, if reformation of its claimed drafting error is allowed, HCCI is entitled to "subtract" from Plaintiff's payout, "all revenue and other value generated as the result of and/or during the time services were performed by [Mr. Feldstein]" without any temporal limits whatsoever;

h.     HCCI has also wrongfully refused to acknowledge that, under a fair and reasonable reading of the Subject Policy as a whole, Plaintiff is entitled to include in its losses the (fairly obvious category of losses) for the amounts it would have earned but for Mr. Feldstein's death;

i.     HCCI has unreasonably delayed, stalled and engaged in coverage gamesmanship for well over a year and has, to date, failed to pay in excess of 90% of Plaintiff's valid and collectible claim;

j.     HCCI improperly viewed the information and documents provided by Plaintiff solely through the lens of creating an artifice for denying coverage;

k.     HCCI has wrongfully refused to acknowledge that, as HCCI itself represents the scope of its Critical Asset Protection Insurance to the general public, the policy protected both Plaintiff's economic investment and anticipated profits in the event of Mr. Feldstein's death; and

l.     HCCI has wrongfully refused to acknowledge that, as HCCI itself represents the scope of its Key Person insurance products to the general public consistent with the titles of the policy applications for both the 2016-17 Policy and 2017-18 Policy, the Subject Policy insures the "financial loss of a key employee," like Mr. Feldstein, and necessarily includes the lost profits that would have been generated but for Mr. Feldstein's untimely death.

## JURISDICTION AND VENUE

2.     This Court has diversity jurisdiction over the parties pursuant to 28 U.S.C. § 1332(a)(2) because this dispute is between a citizen of a State and a citizen or subject of a foreign state and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3.      Roc Nation is a citizen, resident, and domiciliary of the State of New York and HCCI is a citizen of the foreign state of the United Kingdom.

4.      Plaintiff also brings this action pursuant to 28 U.S.C. § 2201, and Rule 57 of the Federal Rules of Civil Procedure, seeking declaratory judgment to determine an actual case or controversy regarding a claim for benefits seeking a determination of the rights and obligations pertaining to the Subject Policy which was issued in this State and this judicial district.

5.      Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in this district.

## THE PARTIES

6.      Roc Nation LLC is, and at all times relevant hereto was, a limited liability company organized under the laws of the State of Delaware, with its principal place of business in New York and an office in California.  As a Limited Liability Company, Roc Nation assumes the citizenship of each of its members.  Roc Nation, LLC has two members: (a) Live Nation Worldwide, Inc.; and (b) Marcy Media, LLC.

      a.      Live Nation Worldwide, Inc., is a Delaware Corporation with its principal place of business in Beverly Hills, California. Thus, Live Nation Worldwide, Inc. is a citizen of the States of Delaware and California for diversity purposes.

      b.      Marcy Media, LLC, is a Delaware Limited Liability Company with its principal place of business in New York, New York. For diversity purposes, the members of Marcy Media, LLC, are citizens of the States of New York, New Jersey, California, and Delaware only.

- 4 -

7. Accordingly, Roc Nation is a citizen, for diversity jurisdiction purposes, of the States of California, Delaware, New Jersey, and New York.

8. Based upon information and belief, HCCI is a United Kingdom-domiciled property and casualty insurance company operating globally that was formed in 1981. The company became part of HCC through acquisition in 2005.[1]

9. Based upon information and belief, at all relevant times, HCCI was and is engaged in the business of, among other things, issuing casualty insurance policies to residents of the States of New York and California; HCCI does business in the State of New York as a surplus line insurer; HCCI underwrites insurance policies for risks and individuals located in the States of New York and California; and, according to HCCI, the insurance policies at issue were "registered and delivered as a surplus line coverage under the [Georgia Code] Surplus Line Insurance Law, O.C.G.A. Chapter 33-5."

## FACTUAL BACKGROUND

### A. Relationship Between Plaintiff and Jordan Feldstein

10. On September 14, 2016, Roc Nation entered into a Purchase Agreement with CAM, a talent management company, whose founder and CEO at the time was Jordan Feldstein.

11. Roc Nation's investment in CAM was primarily to secure CAM's high-profile music industry clients whose affiliations with CAM were due in large part to personal relationships those acts and talent had with Mr. Feldstein.

12. Among CAM's music industry clients, far and away the most valuable client and asset of CAM was the incredibly successful musical group, "Maroon 5," led by its lead singer, Adam Levine. Based on information and belief, Jordan Feldstein and Adam Levine were childhood friends and the two had a long standing personal and professional relationship.

---

[1]    https://www.tmhcc.com/en/about-us/business-structure

13.     Maroon 5 was originally founded in 1994 as "Kara's Flowers" while its members were still in high school.  The band has released six platinum or multi-platinum studio albums (2 of which reached No. 1 on the Billboard Top Album Sales chart), three live albums, two compilation albums as well as releasing a number of extend plays and numerous singles, including 4 songs that reached No. 1 on the Billboard Hot 100.  Maroon 5 has also been nominated for 12 Grammy Awards, winning 3 Grammys.

14.     The band recently concluded its seventh world tour in October 2018 and finished 2018 as the biggest act on U.S. radio airwaves, according to Nielsen Music.  "The group's catalog of songs collected 8.58 billion audience impressions across all monitored radio stations, from 1.95 million plays of their tunes."[2]

**B.      Plaintiff Purchased Two Successive "Key Person" Insurance Policies from HCCI**

15.     In order to protect its multi-million dollar investment in CAM and expectations for the business, Plaintiff prudently purchased two successive "key person" insurance policies from HCCI insuring the life of Jordan Feldstein.

16.     The first HCCI policy covered the periods September 14, 2016 to September 14, 2017, bearing the Unique Market Reference No. B1392BWIF161061 (the "2016-17 Policy"), which provided Plaintiff with $14,500,000 of insurance coverage.  (A true and correct copy of the 2016-17 Policy is attached hereto as Exhibit A).

17.     The second HCCI policy covered the period December 15, 2017 to December 15, 2018, bearing the Unique Market Reference No. B1392BWIF171074 (the "2017-18 Policy" or the "Subject Policy"), which provided Plaintiff with $12,529,222 of insurance coverage.  (A true and correct copy of the 2017-18 Policy is attached hereto as Exhibit B).

---

[2]    https://www.billboard.com/articles/columns/chart-beat/8493151/maroon-5-biggest-act-on-us-radio-2018

18.    When securing Key Person insurance, Plaintiff sought to insure coverage in the event of the Mr. Feldstein's death.  It is undisputed that Maroon 5 alone represented millions of dollars a year of revenue to CAM and that amount is without considering the other artists that left CAM after Mr. Feldstein's death or the acts that Mr. Feldstein surely would have added to CAM had he survived.

19.    Plaintiff did not invest in CAM simply to recoup its original investment.  Plaintiff invested in CAM with the idea of recouping its investment and making a profit for years to come based on Mr. Feldstein's skills and attributes.  With Mr. Feldstein alive, Plaintiff could and most likely would have made many tens of millions of dollars in profits over the life of the partnership (which losses HCCI seeks to simply ignore).

20.    The policy applications submitted by Plaintiff in connection with both the 2016-17 Policy and the 2017-18 Policy confirm Plaintiff's understanding that it was purchasing "key person" insurance policies from HCCI insuring the life of Jordan Feldstein.

21.    The insurance application form created by HCCI and submitted by Plaintiff in connection with the 2016-17 Policy is entitled "KEY PERSON FAILURE TO SURVIVE" and expressly advised Plaintiff that the policy would pay Plaintiff the $14.5 million limits of liability "for the direct financial loss suffered by [Roc Nation] resulting from the non-performance of insured contract due solely to the death or disappearance of [Jordan Feldstein] during the policy of insurance."  (A true and correct redacted copy of the 2016-17 Policy application is attached hereto as Exhibit C).

22.    The application submitted by Plaintiff for the 2016-17 Policy also notes that "no medical exams or medical records are required for application."  Despite this notation, Mr. Feldstein completed and submitted a two page Medical Examiners Report to Exceptional Risk

- 7 -

Advisors (ERA), an authorized HCCI representative located in Mahwah, New Jersey.  ERA was also provided with an additional one page report with attached EKG results submitted in connection with the 2016-17 Policy.

23.     The insurance application form created by HCCI and submitted to HCCI by Plaintiff in connection with the 2017-18 Policy is entitled "Key Man Proposal Form" which was understood by all parties to be an application for renewal of the 2016-17 Policy.  (A true and correct redacted copy of the 2017-18 Policy application is attached hereto as Exhibit D).

24.     Here, it was undisputed that Jordan Feldstein was CAM's key person and that, without Mr. Feldstein's personal relationships, skills and expertise in the music industry, including his personal and long standing personal friendship, relationship and connection with Adam Levine, the lead vocalist of the incredibly successful musical group Maroon 5, CAM would not have been nearly as valuable or as attractive to Plaintiff as it was.

25.      "Key Person" or "Key Man" insurance is generally understood, both within the insurance industry and by businesses seeking this type of coverage, as being a form of business life insurance taken out on the life of the key person of a business, such as the owner, founder or an invaluable employee or two, designed to provide a business with a financial payout should that key person unexpectedly die.

26.     The process of securing a payout under a key person insurance policy is simple:  a company purchases a life insurance policy on the key employee, the company pays the premiums on the policy and is listed as the beneficiary under the policy and, if the key person unexpectedly dies, the company receives the insurance payoff once proof of death has been provided.

27.     This commonly accepted understanding of Key Person or Key Man insurance is wholly consistent with Plaintiff's reasonable expectations as to the type of insurance coverage it

was purchasing from HCCI as evidenced by the "Key Person Failure to Survive" and the "Key Man Proposal Form" applications discussed above.

28.     HCC itself defines Key Man or Key Person insurance as a "policy purchased by a third party to insure for the financial loss of a key employee whose expertise and skill-set have established them as an irreplaceable asset to their firm."[3]  Neither the HCCI policy applications nor the HCC Website hint that this broad "financial loss" is tethered to baffling insurance policy provisions that HCCI later issued.

29.     HCCI defines "Critical Asset Protection Insurance" as a unique and distinct solution that protects the economic investment of a key person or persons in the event of death by any cause…. If that person dies or suffers a catastrophic injury, it could have a serious impact on your client's balance sheet. CAP can shield you from this exposure."[4]

30.     Plaintiff simply requested (and reasonably believed it had purchased) coverage upon the death of Mr. Feldstein in the insured amount.  This is consistent with the protection described on HCCI's website; i.e., an insurance policy to protect Plaintiff against the unanticipated and untimely death of Jordan Feldstein, CAM's key executive who held the long-term relationships with music industry clients like Maroon 5.

31.     Instead of receiving traditional Key Person life insurance policies consistent with Plaintiff's reasonable expectations as evidenced by the policy application forms created by HCCI and submitted by Plaintiff, HCCI issued to Plaintiff insurance policies entitled "Critical Asset Protection Insurance."

32.     HCC describes "Critical Asset Protection" insurance this way:  it is a "unique and distinct solution that protects the economic investment of a key person or persons in the event of

---

[3]     See, https://www.tmhcc.com/en/categories/accident-and-health/key-man; emphasis added (accessed 1/1/19).

[4]     See, https://www.tmhcc.com/en-us/products/critical-asset-protection; emphasis added (accessed 1/1/19).

death by any cause. The product can be used to provide insurance protection for one individual or for a group, such as a sports team or an executive team. The human capital and economic exposure of corporations, professional sports organizations or even an endorsement company can be a massive if an unexpected death or calamitous injury occurs."[5]

## C.    The HCCI Policy Language and The Myriad of Ambiguities in the Two Policies

33.    Both the 2016-17 Policy and the 2017-18 Policy are rife with undefined terms, ambiguities, and undisclosed material changes from the coverages, terms, conditions and limitations set forth in the 2016-17 Policy to those contained in 2017-18 Policy.

34.    Both the 2016-17 Policy and the 2017-18 Policy also expressly state that the "proposal form [*i.e.*, the applications], together with all documents and information provided by the Insured, or on their behalf in support of the proposal, forms the basis of and is incorporated into this insurance."  (*See* Page 7 of the 2016-17 Policy and Page 9 of the 2017-18 Policy; emphasis added).

35.    The "Critical Asset Protection Insurance" Policies issued by HCCI to Plaintiff contain ambiguous, confusing and convoluted insuring agreements and related definitions alternatively covering Plaintiff's "**Direct Ascertained Net Loss**" (the 2016-17 Policy) or its "**Direct Net Ascertained**" loss (the 2017-18 Policy) "directly resulting from the non-performance of the Specific Contract due to the **Insured Person's Failure to Survive** during the **Period of Insurance**."  (Page 8 of Exhibit A and Page 10 of Exhibit B; underlined emphasis added).

36.    Both the 2016-17 Policy and 2017-18 Policy also include the following provision: "words in bold print in this insurance have special meaning, as defined in the DEFINITIONS of

---

[5]    *See*, https://www.tmhcc.com/en-us/products/critical-asset-protection; emphasis added (accessed 1/16/19).

this insurance." The words, terms and phrases set out in bold in the HCCI policies are also set off from the rest of the policy language through the use of initial capital letters.

37.    The Insuring Agreement of the 2016-17 Policy states:

**PART THREE - Cover**

The Insurer will pay the **Direct Ascertained Net Loss**, up to the **Limit of Indemnity**, suffered by the Insured directly resulting from the non performance of the insured contract due to the **Insured Person's Failure to Survive** during the **Period of Insurance**.

38.    The Insuring Agreement of the 2017-18 Policy states:

PART THREE - Cover

1.    The Insurer will pay the Direct Net Ascertained loss, up to the Limit of Indemnity suffered by the Insured directly resulting from the non-performance of the Specific Contract due to the Insured Person's Failure to Survive during the Period of Insurance

39.    While these insuring agreements appear, at first blush, to be similar, they are not. The earlier policy insures against Plaintiff's "**Direct Ascertained Net Loss**" whereas the later issued policy insures against Plaintiff's "**Direct Net Ascertained** loss." The 2017-18 Policy not only juxtaposes "Net" as modifying "Ascertained" instead of "Net" modifying "Loss," and the 2017-18 Policy also fails to either capitalize or bold the word "loss."

40.    Because of these ambiguities, the 2017-18 Policy does not include a definition of "**Direct Net Ascertained** loss" but, instead, defines "**Direct Ascertained Net Loss**" (which is the covering language found in the 2016-17 Policy not in the 2017-18 Policy) using a perplexing and opaque loss calculation and, to compound those errors, the 2016-17 Policy defines "**Direct Ascertained Net Loss**" differently than the 2017-18 Policy and HCC never advised Roc Nation of the change.

41.     The 2016-17 Policy defines "**Direct Ascertained Net Loss**" as follows:

**PART TWO - Definitions**

| | |
|---|---|
| 1. **Failure to survive** | means Death or disappearance of the **Insured Person** solely and directly due to **Bodily Injury** or **Sickness**. |
| 2. **Bodily Injury** | means a specific injury caused solely and independently by an **Accident** and is not the accumulation of a series of accidents and/or traumas and/or any degree of degenerative process. |
| 3. **Accident** | means a single, sudden and unexpected event, which occurs at an identifiable time and place and which directly and independently causes **Bodily Injury** or **Death**. |
| 4. **Sickness** | means illness, sickness or disease of the **Insured Person** which first becomes apparent during the **Period of Insurance** and occasions the death of the **Insured Person** within the **Period of Insurance**. |
| 5. **Limit of Indemnity** | means the maximum amount the Insurer will pay as shown in the Schedule. |
| 6. **Direct Ascertained Net Loss** | means the amount remaining that the Insured is obliged to pay to satisfy it's financial obligation or incurs as a loss under the insured contract after subtracting all revenue and other value generated as the result of and/or during the time services were performed by the **Insured Person**. |
| 7. **Insured Person** | means the person named in the Schedule as the Insured Person. |

42.     The 2017-18 Policy defines "**Direct Ascertained Net Loss**" as follows:

11. **Limit of Indemnity** the maximum amount the **Insurer** will pay as shown in the Schedule.

12. **Direct Ascertained Net Loss** means the amount remaining that the Insured is obliged to satisfy its financial net loss obligation or incurs as a loss under the **Specific Contract** after subtracting all revenue and other value generated as the result of and/ or during the time services were performed by the **Insured**

13. **Specific Contract** means the formal contract between the **Insured** and the **Insured Person**, in which the **Insured Person** agrees to deliver services or to carry out agreed provisions.

43.     Set forth below is a graphic depiction of the differing policy definitions of

"**Direct Ascertained Net Loss**":

| 2016-17 POLICY | 2017-18 POLICY |
|---|---|
| "**Direct Ascertained Net Loss**" … "means the amount remaining that the insured is obliged to pay to satisfy it's [sic] <u>financial obligation</u> or incurs as a loss under the insured contract after subtracting all revenue and other value generated | "**Direct Ascertained Net Loss**" … "means the amount remaining that the insured is obliged to pay to satisfy it's [sic] <u>financial net loss obligation</u> or incurs as a loss under the **Specific Contract** after subtracting all revenue and other value |

| | |
|---|---|
| as the result of and/or during the time services were performed by the **Insured Person**." | generated as the result of and / or during the time services were performed by the **Insured**." |

44.     The ambiguity created by these different definitions is compounded by the fact that neither policy defines "financial obligation" or "financial net loss obligation."

45.     To make a difficult interpretation of an ambiguous policy impossible, the 2016-17 Policy definition of "**Direct Ascertained Net Loss**" refers to the "**Insured Person**" (defined in the policy as Jordan Feldstein), whereas the 2017-18 Policy definition of "**Direct Ascertained Net Loss**" refers to the "**Insured**" (defined as Roc Nation).[6]

46.     Thus, substituting the correct names of the "**Insured Person**" and "**Insured**" into the definitions of "**Direct Ascertained Net Loss**," the provisions read:

| 2016-17 POLICY | 2017-18 POLICY |
|---|---|
| "**Direct Ascertained Net Loss**" … "means the amount remaining that the insured is obliged to pay to satisfy it's [sic] <u>financial obligation</u> or incurs as a loss under the insured contract after subtracting all revenue and other value generated as the result of and/or during the time services were performed by **Jordan Feldstein**." | "**Direct Ascertained Net Loss**" … "means the amount remaining that the insured is obliged to pay to satisfy it's [sic] <u>financial *net loss* obligation</u> or incurs as a loss under the **Specific Contract** after subtracting all revenue and other value generated as the result of and / or during the time services were performed by **Roc Nation**." |

47.     The 2016-17 Policy does not define the phrase "financial obligation," which seems relatively straightforward, and the 2017-18 Policy does not define the term "financial net loss obligation," which is significantly less clear.

48.     Based upon specific information contained in each policy, it is clear that the drafting of the 2016-17 Policy and the 2017-18 Policy were part of standardized form policy language crafted by HCCI and utilized by HCCI for any and all "Critical Asset Protection Insurance" policies issued by the carrier.

---

[6]     Both the 2016-17 Policy and the 2017-18 Policy identify Jordan Feldstein as the "**Insured Person**" on both the Risk Details page and in the definition section.  The Risk Details page of the 2016-17 Policy lists Roc Nation as the "**Assured**" (without providing a definition of "Assured" in the policy) and as the "**Insured**" in the 2017-18 Policy.

49.     The 2016-17 Policy specifically notes that the policy wording is based upon a

2011 standardized form created by HCCI::

CONDITIONS:     Wording HCCSU PA CAP 2011 as attached
                LMA 3100 (09-10) Sanction Limitation And Exclusion Clause
                Biological or Chemical Materials Exclusion Clause NMA 2962
                Pre-Existing Condition Exclusion

50.     Similarly, the 2017-18 Policy specifically notes that the policy wording is based

upon a newly drafted 2017 standardized form created by HCCI:

                                    Registration No. B1392BWIF171074     Page 3 of 30

CONDITIONS:     Wording HCCS PACAPPTD DNAL 2017 UK attached.
                LMA 3100 Sanction Limitation and Exclusion Clause
                NMA 2962 Biological or Chemical Materials Exclusion
                Pre-Existing Condition Exclusion.
                Service of Suit Clause NMA 1998

51.     In short, each, every and all of the ambiguities contained in the 2017-18 Policy

discussed herein are based upon and present in HCCI's standardized 2017 policy form issued to

every "Critical Asset Protection Insurance" policyholder and, as such, they are not the result of

an error in a manuscript policy specifically drafted for a particular policyholder but, instead, the

confusing and shoddily drafted policy provisions at issue survived the internal scrutiny that any

standardized policy form usually undergoes after being created by an insurer, like HCCI.

52.     HCCI unilaterally made the above noted changes in the definition of the term

"**Direct Ascertained Net Loss**" as set out in the renewed 2017-18 Policy without notice to

Plaintiff and these significant policy changes were made by HCC unilaterally *after* the death of

Mr. Feldstein.  Prior to Mr. Feldstein's death, the coverage had been bound but a copy of the

actual policy had not been provided to Plaintiff.

53.     Pursuant to established law, HCCI was required to notify Plaintiff of all material changes to coverage-limiting clauses in policy renewals such as the changes above.

54.     No coverage changes were ever specifically identified in any correspondence accompanying the renewal documents for the 2017-18 Policy.

**D.     Jordan Feldstein's Death and Plaintiff's Claim Submission to HCCI**

55.     Sadly, Mr. Feldstein unexpectedly passed away in Los Angeles on December 22, 2017, after he went into cardiac arrest.

56.     On or about December 27, 2017, Plaintiff advised HCCI of Mr. Feldstein's untimely death through the policies' Placing Broker, Bretton Woods.

57.     Because Mr. Feldstein was the founder and CEO of CAM, his death had a tremendous impact on CAM's business, the extent of which Plaintiff has more than adequately demonstrated to HCCI.

58.     On April 6, 2018, Roc Nation timely submitted a proof of loss to HCCI and noted that the sum insured under the 2017-18 Policy was $12,529,222.

59.     On May 2, 2018, HCCI responded to Roc Nation's proof of loss submission by acknowledging the 2017-18 Policy limit of liability of $12,529,222.00 and requested further information in order to complete its investigation.  At that time, HCCI also appointed outside forensic accountants who subsequently presented Roc Nation with an extensive laundry list of requested documents and information despite the fact that, as noted above, Plaintiff's loss of Maroon 5 alone as part of the CAM assets over the next few years substantially dwarfs (by more than three times) both the $12,529,222 policy limits of the 2017-18 Policy and any revenues generated by other CAM clients.

60.     On May 30, 2018, Plaintiff promptly responded to HCCI and to HCCI's forensic accountants by fully complying with all information and document requests.

61.     However, in an attempt to stall payment of any amount to which Roc Nation was entitled to, HCCI began a procrastination process that lasted several months and has now stretched to beyond a year after Mr. Feldstein's death, by continually claiming that it did not have enough information to pay the claim and by continually and constantly requesting additional documents from Plaintiff on multiple occasions.

62.     In many instances, HCCI's requests were unreasonably broad and lacked any temporal limitations.  HCCI also requested information related to false media reports and information that HCCI knew was not within Plaintiff's control to provide.  Many of these requests have been duplicative and many others sought overtly irrelevant information.  In other cases, HCCI has made unreasonably broad document requests such as 'any communications between the estate and Roc Nation" or 'reports on all post death revenue' with no limitations whatsoever.

63.     At all times, Plaintiff fully and completely cooperated with these unreasonable requests and Plaintiff has, at all times, acted in good faith by producing to HCCI and its forensic accountants the requested information and documents or, alternatively, by directing HCCI to the proper party or parties for documents outside of Plaintiff's control.

64.     On August 8, 2018, Roc Nation responded to HCCI's further request for information with its "fifth (5th) detailed reply to information requests" related to the submission of its claim, to which HCCI replied on August 13, 2018 wherein HCCI falsely claimed to still not have sufficient information to complete its investigation or make a coverage determination.

65.     Ultimately, Roc Nation produced hundreds of pages of financial data, legal documents, and other information in response to more than a half-dozen requests from HCCI and

engaged in communications for more than a year without payment of more than 90% of the

policy limits rightfully due to Plaintiff under the 2017-18 Policy.

66.     Pursuant to the express terms of both the 2016-17 Policy and the 2017-18 Policy,

HCCI agreed to complete its investigation in a "timely manner" after reasonable requests:

**PART SIX – Basis of Settlement**

Once the Insurer has completed their investigations (which shall be completed in a timely manner), the Insurer will pay the Insured the ascertained net financial loss the Insured has suffered, up to the **Limit of Indemnity,** resulting directly from the death or disappearance of the **Insured Person**. Before a loss is paid as a result of the disappearance of the **Insured Person**, the Insured must undertake to repay the Insurer in the event that the **Insured Person** is subsequently found alive.

67.     Ignoring its obligations to timely settle the claim and pay Plaintiff the policy

limits upon Mr. Feldstein's death, HCCI instead engaged in a lengthy campaign to delay and

avoid its payment obligations.

68.     Plaintiff has requested, on multiple occasions, that HCCI narrow its shotgun

approach to seeking irrelevant and overly broad requests or, at a minimum provide support for

such requests.  HCCI rejected or failed to respond to these requests.

69.     HCCI has also requested information outside of Plaintiff's control and, despite

having no obligation to do so, Plaintiff has also put HCCI in contact with relevant third parties

and their counsel and has encouraged those parties to cooperate with HCCI.

70.     When HCCI realized that its lengthy campaign to delay paying all or any part of

Plaintiff's valid and collectable claim breached the implied covenant of good faith and fair

dealing, HCCI sent yet another request for even more information to Plaintiff by letter dated

August 13, 2018, and in that letter offered to make an "advance payment" of less than 10%

($1,176,595) of Plaintiff's valid and collectible claim.

71.     HCCI claimed that this interim payment was for the potential revenue lost for

CAM's clients that either left CAM or did not join Plaintiff, other than Maroon 5.

72.     In its August 13 letter, HCCI specifically noted that the interim payment offered "would not represent a full and final value of the claim, but a value of what has been confirmed for this particular portion of the claim thus far."

73.     On August 20, 2018, Roc Nation accepted HCCI's offer of $1,176,595 as an interim payment, specifically noting that its acceptance did not constitute an admission that the amount was sufficient to satisfy any portion of the claim.

74.     HCCI's long campaign designed to stall, delay and make every effort to minimize its payment obligations under the Subject Policy, culminated in an unprecedented forty-six (46) page denial letter dated September 28, 2018, in which HCCI denied outright "the remainder of the Insured's claim;" *i.e.*, the $11,352,627 owed over and above the interim payment of $1,176,595.

75.     In its 46-page September 28, 2018 denial letter, HCCI breached the covenant of good faith and fair dealing implied in the 2017-18 Policy issued to Plaintiff as detailed herein.

**E.     HCCI's Misplaced Reliance on Ambiguous Provisions of the 2017-18 Policy to Outright and Wrongfully Deny Plaintiff's Valid Claim Constitutes Bad Faith**

76.     HCCI seeks to limit Plaintiff's valid and collectible claim by falsely asserting that a phrase found, not in the exclusion section of the 2017-18 Policy but, rather, in the definition of "**Direct Ascertained Net Loss**" allows HCC to re-calculate Plaintiff's loss *ad infinitum*.  That phrase is:  "subtracting all revenue and other value generated as the result of and/or during the time services were performed by the **Insured**."

77.     HCCI's interpretation of the limitation clause in the definition of "**Direct Ascertained Net Loss**" is untenable and it is not supported by established law or by the language of HCCI's own standardized policy.

78.     HCCI's interpretation of the limitation clause in the definition of "**Direct Ascertained Net Loss**" invokes an outrageously unrealistic view of what can be accomplished by a dead person because HCCI is claiming that all CAM revenue forever is "generated as a result of" Mr. Feldstein and that simply is not reality in the artist management business.

79.     Talent needs constant attention and HCCI's position in this case diminishes the value of many hardworking people who work to keep an artist's career moving forward on a daily basis.

80.     The "subtracting all revenue" clause is neither clear, unambiguous nor specific, and it certainly failed to advise the policyholder that, in the event of Mr. Feldstein's death, HCCI could withhold payment of the policy limits for an undefined period of time potentially lasting 5, 10 or 20 years.

81.     If HCCI had wanted to limit coverage in the manner it now proposes, HCCI and HCCI alone was legally obligated to clearly and unambiguously advise Plaintiff that the payout under the HCC Key Man insurance policy could be delayed for a decade or more and HCCI failed to do so.

82.     In its 46-page denial letter, HCCI relied on its own ambiguous language in the 2017-18 Policy when it quoted verbatim the definition of "**Direct Ascertained Net Loss**" and then stated "all revenue and other value generated as the result of and/or during the time services were performed by _Feldstein_ must be subtracted from any amounts remaining to be recouped on the Aggregate Purchase Price."

83.     However, as noted above, HCCI's own policy defines Mr. Feldstein as the "**Insured Person**" and Roc Nation as the "**Insured**."  So HCCI's insertion of Mr. Feldstein in the 2017-18 Policy definition is not supported by HCCI's policy language and, because Roc

Nation performed no services for CAM, no revenue subtractions could be made under that provision.

84.     Roc Nation, on its part, performed <u>no</u> services for CAM and therefore <u>no</u> deductions could or should be made under the express language of the last clause of the definition of "**Direct Ascertained Net Loss**."

85.     HCCI's interpretation of this clause as having no temporal limit runs contrary to HCCI's obligation under the express provisions of the policy it crafted, to complete its investigation and settle the claim "in a timely manner" [Page 12 of the 2017-18 Policy] and the fact that the policy requires that any legal action by Roc Nation must be commenced within 3 years of the date written proof of loss is submitted [Page 15].

86.     Both the 2016-17 Policy and the 2017-18 Policy expressly note that Plaintiff must file any legal action against HCCI "within three (3) years of the date the written proof of loss is required to be submitted":

12.     **Legal actions**
No action on this policy may be brought until sixty (60) days after written proof of loss has been given to **Insurers**, and any action must be started within three (3) years of the date the written proof is required to be submitted.

87.     Despite this explicit temporal limitation on Plaintiff's right to pursue legal recourse, HCCI takes the position that it is entitled to "subtract all revenue and other value generated as the result of and/or during the time services were performed by [Plaintiff]" through some unspecified period of time (unlimited according to HCCI's 46-page denial letter), well beyond the 3-year limitation period in the policy.

88.     Allowing HCCI an indefinite period of time to pay the claim as HCCI now suggests is directly at odds with the other time limitations set forth in HCCI's own policy and,

because established law requires that the policy be interpreted as a whole, HCCI's "no temporal limits" position should be rejected.

89.     Because the "subtracting all revenue" clause is susceptible to the more reasonable interpretation and understanding of the policyholder; *i.e.*, that it must both practically and necessarily include a temporal limitation, the clause is rendered vague and ambiguous and must be interpreted in favor of coverage for Plaintiff's claim and strictly against HCCI.

90.     Because HCCI is wielding the "subtracting all revenue" clause of the definition of "**Direct Ascertained Net Loss**" as a sword in an attempt to limit or otherwise preclude coverage for Plaintiff's loss, HCCI was duty bound to express such purported exclusionary language in clear, unequivocal and unambiguous terms.  HCCI failed to do so, not only HCC chose to alter the definition of "Ascertained Net Loss" to include the value generated by the "Insured" rather than those generated by the "Insured Person" as in the 2016-17 Policy but also by injecting the undefined term "net loss" into the "financial obligation" language of the 2017-18 Policy definition in contravention of established law.

91.     Under established law, the HCCI policy must be read in light of the reasonable expectations of the average policyholder in order to determine whether the provision, as written, is sufficiently clear and precise such that there is no room for reasonable disagreement about the scope of coverage.

92.     Here, Plaintiff's reasonable expectations were that, because Plaintiff purchased a Key Person insurance policy on Jordan Feldstein and the "**Insured**" was listed as Plaintiff under both policies, Plaintiff would receive the policy limits of $12,529,222.00 soon after Mr. Feldstein's unexpected death.

93.     No reasonable policyholder in Plaintiff's position would interpret the "subtracting all revenue" clause in the definition of "**Direct Ascertained Net Loss**" as allowing HCCI to delay, stall and withhold payment under the policy for undefined and unlimited period of law. The impracticality of such a position alone renders the clause vague, ambiguous and unenforceable.

94.     In its 46-page denial letter, HCCI also wrongly contends that it is entitled to subtract all post-mortem revenue *ad infinitum*, Plaintiff is not entitled to include in the revenue calculations, all "losses associated with Mr. Feldstein's lack of participation over the expected term of the business" because, according to HCCI, such a position is meritless and not supported by the Policy language."

95.     Indeed beyond the investment loss suffered by Plaintiff under the Purchase Agreement (which is a fixed number), it is only reasonable to look to the future to project the true financial losses Plaintiff will suffer as well; *i.e.*, what would Mr. Feldstein's continued involvement in CAM have meant to Roc Nation financially?

96.     Under HCCI's revised definition of "**Direct Ascertained Net Loss**" in the 2017-18 Policy, HCCI agreed to reimburse Plaintiff for its "financial net loss obligation" as well as amounts the Plaintiff "incurs as a loss" under the **Specific Contract**.  HCCI failed to define the phrase "financial net loss obligation."

97.     However, because the definition of "**Direct Ascertained Net Loss**" (a) includes the word "loss" in the defined term itself, (b) includes the term loss in the undefined term "financial net loss obligation," and (c) includes the phrase "incurs a loss," as part of the amounts covered under the Subject Policy it is both fair and reasonable to interpret that provision as allowing Plaintiff to offset any deductions to be made by HCCI, as against any and all losses

sustained by Plaintiff as a direct result of Mr. Feldstein's death, consistent with the reasonable expectations of the Plaintiff and based upon a fair and reasonable interpretation of the policy as a whole in order to determine the Loss attributable to Mr. Feldstein's death.

98.    In its 46-page denial letter, HCCI also raised a number of issues it never raised before none of which preclude coverage here.

99.    Additionally, HCCI's claim that, after having fully and completely responded to over a half dozen requests for information and documentation, Plaintiff has somehow violated the cooperation clause of the policy such that HCCI has any arguable right to deny coverage based upon a baseless claim in this regard is wholly without merit and its attempt to rely on this pretext to deny coverage constitutes bad faith.

100.    HCCI's refusal to timely pay Plaintiff's claim has caused Plaintiff to suffer significant consequential damages.   When the HCCI policies were issued, HCCI understood that, if HCCI breached the policies, Plaintiff would suffer consequential damages.

## CLAIMS FOR RELIEF

### AS AND FOR A FIRST CLAIM
### UPON WHICH RELIEF MAY BE GRANTED
#### (Breach of Insurance Contract)

101.    The averments of paragraphs 1 through 100 are repeated and incorporated by reference as though more fully stated herein.

102.    Plaintiff has fully complied with and have performed all of the conditions and covenants on their part to be performed under the Subject Policy.

103.    HCCI breached the Subject Policy in a number of ways including, without limitation, the following:

a.      Failing and refusing to acknowledge coverage for the full policy limits of the Subject Policy;

b.      Failing and refusing to pay Roc Nation the full policy limits of the Subject Policy and, instead, denying coverage outright for $11,352,627 of the $12,529,222 policy limits;

c.      Failing to properly and timely investigate the Claim and to conclude its investigation in a timely manner as required under the policy; and

d.      Misrepresenting during the procurement process that Plaintiff was applying for and purchasing standard Key Person insurance;

e.      Improperly interpreting the "subtracting all revenue" limiting language of the definition of "**Direct Ascertained Net Loss**" in the Subject Policy as having no temporal limit and wrongfully insisting that it is entitled to reduce the payout under the Subject Policy beyond the reasonable understanding of Plaintiff and any  reasonable interpretation of the language of the Subject Policy;

f.      Wrongfully refusing to acknowledge that, under a fair and reasonable reading of the Subject Policy as a whole, Plaintiff is entitled to reduce the "subtractions" sought to be made by HCCI with the losses incurred by Plaintiff during the same period of time directly;

g.      Wrongfully refusing to acknowledge that, as HCCI itself represents the scope of its Critical Asset Protection Insurance to the general public, the Subject Policy protected Plaintiff's economic investment and anticipated profits in the event of Mr. Feldstein's death; and

h.    Wrongfully refusing to acknowledge that, as HCCI itself represents the

scope of its Key Person insurance products to the general public consistent with the titles

of the policy applications for both the 2016-17 Policy and 2017-18 Policy, the Subject

Policy insures the "financial loss of a key employee" like Mr. Feldstein and necessarily

includes the lost profits that would have been generated but for Mr. Feldstein's untimely

death.

104.    Plaintiff has been damaged, in an amount to be established at trial, as a direct and

proximate result of the above listed contract breaches (and others) committed by HCCI.

105.    As a direct and proximate result of HCCI's breaches of its obligations, Plaintiff

has suffered, and continues to suffer, substantial direct monetary damages in an amount to be

established at trial, including consequential damages, pre-judgment and post-judgment interest,

and costs incurred by Plaintiff in bringing this action against HCCI.

106.    These damages are foreseeable damages incurred by Plaintiff as a direct result of

HCCI's wrongful conduct, which were contemplated by the parties when they negotiated and

executed the HCCI policies and should be awarded so that Plaintiff is adequately compensated

for HCCI's wrongful conduct.

**AS AND FOR A SECOND CLAIM**
**UPON WHICH RELIEF MAY BE GRANTED**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

107.    The averments of paragraphs 1 through 106 are repeated and incorporated by

reference as though more fully stated herein.

108.    Implied in the Subject Policy is a covenant that HCCI would act in good faith and

deal fairly with Plaintiff.  That obligation includes, among other things, an obligation that HCCI

would not do anything to interfere with the Plaintiff's rights to receive the benefits due and

owing under the Subject Policy and that HCCI would give as much, if not more, consideration to the Plaintiffs' interest as HCCI gave to its own interests in responding to this loss.

109.    Instead of complying with these duties and obligations, HCCI has acted in bad faith by, among other things, unreasonably, without good cause, and in bad faith:

a.    Viewing, in bad faith, the information, records and documents provided by Plaintiff in support of its claim through the lens of creating an artifice for denying coverage rather than supporting coverage;

b.    Engaging in a systematic and orchestrated effort to stall, delay and stonewall payment of Plaintiff's valid and collectible claim;

c.    Failing to promptly and properly investigate Plaintiff's claim with an eye towards honoring its contractual obligations while stringing the Plaintiff along;

d.    Wrongfully insisting that the "subtracting all revenue" language of the definition of "**Direct Ascertained Net Loss**" in the Subject Policy has no temporal limit;

e.    Wrongfully insisting that it is entitled to reduce the payout under the Subject Policy way beyond the reasonable understanding of Plaintiff and way beyond a reasonable interpretation of the language of the Subject Policy;

f.    Wrongfully refusing to acknowledge that, under a fair and reasonable reading of the Subject Policy as a whole, Plaintiff is entitled to reduce the "subtractions" sought to be made by HCCI with the losses incurred by Plaintiff during the same period of time directly resulting from Mr. Feldstein's death and the loss of artists, including Maroon 5, who had previously been with Mr. Feldstein;

g.    Wrongfully refusing to acknowledge that, as HCCI itself represents the scope of its Critical Asset Protection Insurance to the general public, the Subject Policy

protected Plaintiff's economic investment and anticipated profits in the event of Mr.
Feldstein's death;

      h.    Wrongfully refusing to acknowledge that, as HCCI itself represents the
scope of its Key Person insurance products to the general public consistent with the titles
of the policy applications for both the 2016-17 Policy and 2017-18 Policy, the Subject
Policy insures the "financial loss of a key employee" like Mr. Feldstein and necessarily
includes the lost profits that would have been generated but for Mr. Feldstein's untimely
death;

      i.    Wrongfully claiming that, after having fully and completely responded to
over a half dozen requests for information and documentation, Plaintiff has somehow
violated the cooperation clause of the policy such that HCCI has any arguable right to
deny coverage based upon a baseless claim in this regard; and

      j.    Otherwise acting contrary to the obligations imposed by the implied
covenant of good faith and fair dealing in the Subject Policy.

110.    In breach of the implied covenant of good faith and fair dealing, HCCI did the
things and committed the acts alleged above for the purpose of consciously withholding from
Plaintiff the rights and benefits to which Plaintiff is entitled under the Subject Policy.

111.    The acts described above by HCCI are (a) inconsistent with Plaintiff's reasonable
expectations; (b) contrary to established claims practices and legal requirements; (c) contrary to
insurance industry custom and practice; and (d) contrary to the express terms of the Subject
Policy.  They constitute bad faith.

112.    As a direct and proximate result of the unreasonable and bad faith conduct of
HCCI, Plaintiff has suffered, and will continue to suffer, damages under the Subject Policy, plus

interest, and other economic and consequential damages, in a total amount to be shown at the time of trial.

113.    As a direct and proximate result of HCCI's breaches of its obligations, Plaintiff has suffered, and continues to suffer, substantial direct monetary damages in an amount to be established at trial, including consequential damages, pre-judgment and post-judgment interest, and costs incurred by Plaintiff in bringing this action against HCCI.

114.    These damages are foreseeable damages incurred by Plaintiff as a direct result of HCCI's wrongful conduct, which were contemplated by the parties when they negotiated and executed the HCCI policies and should be awarded so that Plaintiff is adequately compensated for HCCI's wrongful conduct.

115.    The conduct by HCCI is despicable and outrageous, and was done with a conscious disregard of the rights and reasonable expectations of the Plaintiff and the public at large, constituting oppression, fraud, and/or malice.  HCCI engaged in the acts cited herein for the sole purpose of improperly denying benefits due under the Subject Policy.  HCCI's continued use of an ambiguous standardized form to subsequently deny coverage after an insured experiences a calamitous event is morally reprehensible and egregious.

116.    Specifically, by acting as alleged above, in light of the information, facts, and relevant law to the contrary, HCCI consciously disregarded the rights of the Plaintiff.

117.    By doing these things, HCCI wrongfully deprived the Plaintiff of the benefit of the policy and inflicted substantial damage on the Plaintiff.  HCCI ignored the interests and concerns of the Plaintiff, with the requisite intent to injure.  Therefore, Plaintiff is entitled to recover punitive damages from HCCI in an amount that is sufficient to punish and make an example of HCCI and in order to deter similar conduct by HCCI in the future.

118.    Additionally, Plaintiff is entitled to recover all of the costs, expenses, and attorneys' fees reasonably incurred by the Plaintiff to obtain the benefits of insurance that have been, and continue to be, wrongfully and in bad faith withheld by HCCI.  When the precise amounts of these costs, expenses and fees are known, the Plaintiff will seek leave of Court to amend this complaint.

119.    HCCI should be held liable for punitive damages, because it engaged in egregious tortuous conduct, as described more fully herein and as will be established at the time of trial. Punitive damages are warranted to deter others from engaging in similar misconduct.

**AS AND FOR A THIRD CLAIM**
**UPON WHICH RELIEF MAY BE GRANTED**
**(Declaratory Relief)**

120.    The averments of paragraphs 1 through 119 are repeated and incorporated by reference as though more fully stated herein.

121.    An actual controversy has arisen, and now exists, between Plaintiff on the one hand and HCCI on the other, with respect to whether the Plaintiff is entitled to recover the full $12,529,222 policy limits of the Subject Policy.

122.    As to this controversy, the Plaintiff requests that the Court make and enter a binding judicial declaration that:

a.    HCCI is obligated to pay to the Plaintiff the full $12,529,222 policy limits of the Subject Policy;

b.    HCCI led Plaintiff to reasonably belief that it was purchasing traditional "Key Person" and "Key Man" insurance, as set forth in the applications for both the 2016-17 Policy and the 2017-18 Policy both of which were specifically incorporated into each policy;

c.    As written, the definition of "**Direct Ascertained Net Loss**" in the Subject Policy requires HCCI to take into consideration the losses Plaintiff has suffered and will, in the future suffer, as a direct result of Mr. Feldstein's death;

d.    As written, the definition of "**Direct Ascertained Net Loss**" in the Subject Policy prohibits HCCI from subtracting any revenue or other value generated as result of and/or during the time services were performed by the Insured [Roc Nation]" because Plaintiff performed <u>no</u> services for CAM and, therefore, <u>no</u> deductions could or should be made under the express language of the last clause of the definition;

e.    HCCI is not entitled, under established law, to reform its policy to change "**Insured**" to "**Insured Person**" as used in the definition of "**Direct Ascertained Net Loss**" crafted by HCCI for its standard policy form and as used in the Subject Policy;

f.    Because the "subtracting all revenue" clause in the definition of "**Direct Ascertained Net Loss**" in the Subject Policy is susceptible to the more reasonable interpretation and understanding of the policyholder; *i.e.*, that it must both practically and necessarily include a temporal limitation, the clause is rendered vague and ambiguous and must be interpreted in favor of coverage for Plaintiff's claim and strictly against HCCI.

g.    Because the definition of "**Direct Ascertained Net Loss**" as used in the Subject Policy includes the word "<u>loss</u>" in the defined term itself and because it includes the term <u>loss</u> in the undefined term "financial net <u>loss</u> obligation," and because it includes the phrase "incurs a <u>loss</u>," as part of the amounts covered under the Subject Policy, that provision must be interpreted as allowing Plaintiff to offset any deductions to be made by

HCCI, as against any and all losses sustained by Plaintiff as a direct result of Mr. Feldstein's death;

      h.     If HCCI is allowed to reform the Subject Policy to change "**Insured**" to "**Insured Person**" as used in the definition of "**Direct Ascertained Net Loss**" drafted by HCCI, then HCCI's attempt to limit coverage under that definition by "subtracting all revenue and other value generated as the result of and/or during the time services were performed by [Mr. Feldstein]" must, consistent with a plain reading of the policy language as a whole, include a temporal limit to such deductions;

      i.     No exclusions apply to bar coverage; and

      j.     Plaintiff has fully complied with all requirements under the Subject Policy.

123.     The requested declarations are both necessary and proper at this time under the circumstances in that the interests of judicial economy and substantial justice will be served thereby.

124.     Plaintiff is informed and believes, and upon that basis alleges, that HCCI disputes all or part of the contentions set forth in the preceding paragraphs.

125.     Plaintiff seeks the judicial declarations set forth above.

## JURY TRIAL DEMAND

126.     Plaintiff demands a trial by jury on each issue triable thereby.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment:

      a.     Awarding compensatory and consequential damages in favor of Plaintiff against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be determined at trial, including interest thereon;

b.  Awarding punitive damages in favor of Plaintiff against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

c.  Making the judicial declarations set forth above in favor of Plaintiff and in favor of coverage for Plaintiff's claim;

d.  Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

e.  Awarding such other and further relief as this Court may deem just and proper.

DATED:  January 18, 2019

**Reed Smith LLP**

By: */s/ Christopher P. Hoffman*
Christopher P. Hoffman
REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 521-5400
Facsimile:  (212) 521-5450

Richard C. Giller
(*pro hac vice* application
forthcoming)
REED SMITH LLP
355 South Grand Avenue
Suite 2900
Los Angeles, CA 90071
Telephone: (213) 457-8028

Attorneys for Plaintiff,
ROC NATION, LLC