UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROC NATION LLC,<br><br>                    Plaintiff and Counterclaim<br>                    Defendant,<br><br>          -v-<br><br>HCC INTERNATIONAL INSURANCE<br>COMPANY, PLC,<br><br>                    Defendant and Counterclaim<br>                    Plaintiff. | 19 Civ. 554 (PAE)<br><br>OPINION &<br>ORDER |

PAUL A. ENGELMAYER, District Judge:

This case is an insurance dispute between Roc Nation LLC ("Roc Nation") and its insurer, HCC International Insurance Company, PLC ("HCC"). In 2016, Roc Nation acquired part of a talent-management agency, Career Artist Management ("CAM"), from Jordan Feldstein. Feldstein was CAM's founder and—largely through his representation of the band Maroon 5 and its lead singer, Adam Levine—its principal business generator. Given Feldstein's centrality to CAM, he and Roc Nation agreed, in the contract governing Roc Nation's partial acquisition of CAM, to obtain insurance protecting Roc Nation's investment should Feldstein die or become disabled. Roc Nation obtained such insurance from HCC, first in 2016, and then in a renewed policy, late in 2017.

Soon after the second policy went into effect, Feldstein died. HCC then engaged in a long investigation of Roc Nation's claim under the policy, during which time it paid out a small portion of what Roc Nation claimed it was due. In the end, however, the parties were far apart in how to interpret the policy terms bearing on Roc Nation's claim, and HCC denied the vast majority of that claim. This litigation ensued.

After lengthy and contentious discovery, Roc Nation and HCC now both move for summary judgment, as to two aspects of their dispute.

First, HCC argues that Roc Nation is precluded from any recovery because Roc Nation failed to cooperate with HCC's investigation of its claim.  Roc Nation disagrees, arguing that the record shows it substantially complied with that investigation.

Second, the parties cross-move as to the construction of the central policy language. HCC argues that, after reforming the policy to cure "scrivener's errors," it unambiguously requires any payment to Roc Nation to be reduced by all future profits Roc Nation might secure that are in any way traceable to CAM or Feldstein's services.  Those, according to HCC, include (1) sums generated after Feldstein's death by artists that left CAM to be managed by Roc Nation; and (2) sums Roc Nation received under a separate "termination agreement" with other artists who left CAM and did not transition to Roc Nation.  Roc Nation opposes reformation of the contract.  And it argues that—with or without HCC's proposed revisions—the policy supports that Roc Nation is entitled to recover from HCC its full investment in CAM, reduced only by dividends it had actually received from CAM by the time Feldstein died.

For the following reasons, the Court denies HCC's motion for summary judgment and grants Roc Nation's motion for partial summary judgment.  HCC has not carried its burden of showing that Roc Nation's lack of cooperation requires preclusion of its claim, and Roc Nation's interpretation of the Policy—subject to a narrow limitation—is correct.

I.      **Background**

     A.      **Factual Background**[1]

         1.      **The Parties**

Roc Nation is a Delaware limited liability company with its principal place of business in New York and an office in California.  FAC ¶ 6.  All its members are citizens of Delaware, New York, New Jersey, or California.  *Id.*  It is a subsidiary of Live Nation Entertainment, Inc. ("Live Nation").  Counterclaim ¶ 3.

HCC is a property and casualty insurance company domiciled in the United Kingdom.  FAC ¶ 8.  Between 2016 and 2018, it provided insurance coverage to Roc Nation under a "Critical Asset Protection Insurance" policy.  JSF App'x, Ex. 37 ("Policy").

---

[1] The Court draws its account of the facts from the parties' respective submissions on summary judgment.  Those include the parties' joint statement of undisputed facts, Dkt. 164 ("JSF"), accompanying exhibits, Dkts. 166–67 ("JSF App'x"), and Roc Nation's Notice of Errata to the JSF, Dkt. 177; HCC's Local Rule 56.1 statement, Dkt. 173-1 ("HCC 56.1"), subject to Roc Nation's evidentiary objections to it, Dkt. 189 ("RN Objections"); Roc Nation's Local Rule 56.1 statement, Dkt. 183 ("RN 56.1"); Roc Nation's counter-statement to HCC's Local Rule 56.1 statement, Dkt. 187 ("RN Reply 56.1"); and HCC's counter-statement to Roc Nation's Local Rule 56.1 statement, Dkt. 194 ("HCC Reply 56.1").  The Court has further considered the first declaration of George C. Vogrin, Esq., in support of HCC's motion, Dkt. 172 ("First Vogrin Decl."); the declaration of Amber Finch, Esq., in support of Roc Nation's motion, Dkt. 185 ("Finch Decl."); the reply declaration of Mr. Vogrin, Dkt. 198 ("Second Vogrin Decl."); and exhibits attached to each declaration, including some in corrected form, Dkts. 220, 223.  The Court has also reviewed, for context and not for the truth of the matters asserted, Roc Nation's First Amended Complaint, Dkt. 18 ("FAC"); HCC's Answer to the FAC, Dkt. 20 at 1–18 ("Answer"); and HCC's Counterclaim, Dkt. 20 at 18–32 ("Counterclaim").

Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein.  When facts stated in a party's 56.1 statement are supported by testimonial, video, or documentary evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

### 2.    Jordan Feldstein and CAM

CAM is a talent-management company founded by Jordan Feldstein.  JSF ¶ 1.  Feldstein was an artist manager and represented various musical acts through CAM.  *Id.*  Among these were Maroon 5 and its lead singer, Adam Levine, a childhood friend of Feldstein's.  *Id.* ¶ 2.  Feldstein had represented both Maroon 5 and Levine since the band's inception, but never had a written agreement with either act.  *Id.* ¶¶ 2–3.  Maroon 5 and Levine were, by far, CAM's most successful acts, generating the vast majority of CAM's annual revenue.  *Id.* ¶ 4.

### 3.    The Purchase Agreement

In April 2016, Feldstein approached Roc Nation about Roc Nation's potential investment in CAM.  *Id.* ¶ 5.  Feldstein offered Roc Nation his shares of CAM in exchange for $22 million, based on projections that CAM would generate $44 million during the next five years.  *Id.* ¶¶ 5–7.

On September 14, 2016, Feldstein agreed to sell his 49% ownership interest in CAM to Roc Nation in increments over the next several years.  *Id.* ¶ 8; *see* JSF App'x, Ex. 7 ("Purchase Agreement").  At the time of signing, Feldstein sold his 32.667% vested interest in CAM to Roc Nation for $14,614,399.  JSF ¶ 8.  The Purchase Agreement provided Roc Nation with the option to buy Feldstein's remaining 16.33% share in CAM, subject to certain conditions, for two later installments of $5,307,210 and $1,999,766.  *Id.* ¶ 9; Purchase Agreement § 2.1(b)(ii), (c)(i).

The Purchase Agreement also required Feldstein to work with Roc Nation to obtain a "key man insurance policy payable to [Roc Nation] upon the death or disability of [Feldstein] in an amount not less than the aggregate purchase price paid at such Closing less any Recouped Purchase Price as of such date."  Purchase Agreement § 5.2.  It defined "Recouped Purchase Price" as the "amount of distributions actually paid to [Roc Nation] by [CAM] in accordance with the Restated Operating Agreement with respect to the membership interests acquired

pursuant to this Agreement."  *Id.* § 1.1; *see* JSF App'x, Ex. 9 ("Restated Operating Agreement")

§ 7.1.1 (requiring CAM to disburse distributions to its shareholders, such as CAM, annually).

### 4.    The 2016 Policy

In August 2016, Roc Nation approached its retail insurance broker, Hal Blackman, to

insure the lives of both Feldstein and Levine.  JSF ¶ 12.  Blackman sought to obtain a "key man

life insurance" policy for Feldstein through a wholesale insurance broker, but failed.  *Id.* ¶¶ 13–14.

Blackman testified that he was unable to obtain an "off the rack" life-insurance policy given

Feldstein's medical history.  HCC 56.1 ¶ 6.  Blackman then sought out "alternative markets"

through Alive Risk, another wholesale insurance broker, which in turn contacted Bretton Woods,

a London market broker, to seek a quote for coverage.  HCC 56.1 ¶ 7; JSF ¶ 15.  Bretton Woods

obtained a quote from HCC.  JSF ¶ 15.  On September 14, 2016, HCC bound policy slips for two

insurance policies issued to Roc Nation: one for Feldstein and one for Levine.  *Id.* ¶ 16; *see* JSF

App'x, Ex. 13 ("2016 Policy").

The 2016 Policy, which covered Feldstein, was termed "Critical Asset Protection

Insurance."  *See* 2016 Policy.  It provided the following "Cover" from September 14, 2016,

through September 14, 2017:

> The Insurer will pay the **Direct Ascertained Net Loss**, up to the **Limit of Indemnity**, suffered by the Insured directly resulting from the non performance of the insured contract due to the **Insured Person's Failure to Survive** during the **Period of Insurance**.
>
> In no event shall the Insurer be liable to pay more than the **Limit of Indemnity**.

*Id.* at 8.  The "Limit of Indemnity" was $14.5 million, slightly less than Roc Nation's investment

in CAM at that point.  *Id.* at 2.  And "Direct Ascertained Net Loss" was defined as

the amount remaining that the Insured is obliged to pay to satisfy [its] financial obligation or incurs as a loss under the insured contract after subtracting all revenue and other value generated as the result of and/or during the time services were performed by the **Insured Person**.

*Id.* at 7.  "Insured Person" meant Feldstein, while "Insured" referred to Roc Nation.  *Id.* at 2.

On October 7, 2016, HCC received a copy of the Purchase Agreement and Restated Operating Agreement.  JSF ¶ 18.  The same day, HCC's underwriter, David Keoshgerian, reviewed those documents and discussed them with Philip Hall, the Managing Director of the Tokio Marine HCC Specialty Group ("TMHCC").  *Id.* ¶¶ 19–20.  After noting he had reviewed the Purchase Agreement "in some detail," Hall stated, "[u]ltimately it seems clear to me that we are covering the limit as stipulated within Section 5.2 (Key Man Insurance) being 'the aggregate purchase price paid at such closing less any Recouped Purchase Price as of such date', being a maximum of $14.5m within the policy."  *Id.* ¶ 20.  But, he noted, he could not find a definition for "Recouped Purchase Price," and asked for clarification given that "it's really important to button down this element at inception, rather than getting into a muddle at point of loss."  *Id.*

## 5.    The Policy

On September 14, 2017, the 2016 Policy expired.  On October 3, 2017, Blackman emailed Alive Risk asking if the policy had been renewed, and was told that it had not been.  *Id.* ¶ 24.  He then asked Alive Risk to explore renewal.  *Id.*  The next day, Bretton Woods wrote to Keoshgerian at HCC about renewing the 2016 Policy.  *Id.* ¶ 25.  Keoshgerian requested justification for the sum insured, noting that he wasn't sure it "was ever nailed down" in 2016.  *Id.* ¶ 26.  On December 5, 2017, Bretton Woods responded, seeking "the same coverage as last year if possible," and noting that Roc Nation knew that HCC needed justification for the $14.5 million sum insured.  *Id.* ¶ 27; JSF App'x, Ex. 21 at 8–9.

On December 6, 2017, Roc Nation clarified to Blackman that, instead of the $14.5 million limit from the 2016 Policy, it now sought only $12,529,922 in coverage, but that it would likely "need to increase the amount of coverage next year by about $5M." JSF App'x, Ex. 22 at 5. After Blackman asked for justification for those amounts, Roc Nation explained that it had bought a portion of CAM for $14.6 million in 2016, but had since recovered "$2.1M in dividends[,] [l]eaving us with exposure of $12.5M." *Id.* at 3. It also stated that it planned to buy Feldstein's remaining in interest in CAM in 2018 for $7.3 million, but expected to receive 2017 dividends worth $2.3 million, leaving it with $5 million in net new exposure, and so expected to seek coverage in 2018 of $17.5 million. *Id.* In other words, each year, Roc Nation expected to seek coverage based on its investment in CAM less the dividends it had actually recouped from CAM. *See id.* at 4 ("Each year after we receive dividends we will likely look for less coverage on renewals of the policy as our exposure goes down. In essence, we want to make sure we are made whole on our investment in the worst case scenario.").

On December 11, 2017, Bretton Woods forwarded a summary of Roc Nation's above explanation, along with the Purchase Agreement, to Keoshgerian at HCC, who stated he was "happy" with the justification. JSF ¶¶ 32–33. On December 14, 2017, Blackman informed Roc Nation that HCC had agreed to provide the $12,529,922 cover for both Levine and Feldstein,[2] and asked Roc Nation for approval to bind coverage. *Id.* ¶ 36. Roc Nation did so. *Id.* The same

---

[2] In 2016, HCC issued two separate policies—one for Feldstein and one for Levine. In 2017, the two policies were combined into one, with the same coverage amount and premium for each. JSF ¶ 36. The policy contained a "first to die" clause, which meant that the coverage amount remained the same whether only one or both insured persons passed away. *Id.* ¶¶ 33, 38–40, 45; *see id.* ¶ 34 (Alive Risk stated in December 2017 that "[t]he coverage afforded by intent is that if Levin[e]/Feldstein die or are disabled Roc Nation gets paid for their purchase of the business. Essentially the critical assets are gone so they can't make money on what they bought."). That suggests that, to Roc Nation, losing Feldstein amounted to losing Levine, and vice versa.

day, Blackman instructed Alive Risk to bind coverage.  *Id.* ¶ 37.  On December 15, 2017,

Bretton Woods asked HCC to do so.  *Id.* ¶ 38.  The same day, HCC sent a proposed policy,

stating, "[t]here is no material change to the cover but the relevant sections have been updated

for legal and compliance purposes."  *Id.* ¶ 40.  Over the next several days, Bretton Woods and

HCC exchanged drafts of the policy, with each proposing wording changes.  *See Id.* ¶¶ 40–43.

Among those, on December 20, 2017, HCC requested that the policy include, under "Information,"

a note that "the specific contract referred to in this policy is the Purchase Agreement entered into

as of the 14th day September, 2016, by and among Career Artist Management, Jordan Feldstein

and Roc Nation."  *Id.* ¶ 43.  On December 21, 2017, HCC bound coverage for the policy,

effective from December 15, 2017.  *Id.* ¶ 44.  Roc Nation paid the premium for it.  *Id.* ¶ 47.

Aside from setting the coverage amount at $12,529,222[3] instead of $14.5 million, the

Policy largely tracked the 2016 Policy.  But two terms discussed above—Cover and the

definition of Direct Ascertained Net Loss—contained minor deviations from the 2016 Policy.

HCC contends these are mere "scrivener's errors," whereas Roc Nation argues they, among other

features, render the Policy ambiguous.  First, the Policy describes the Cover as follows:

> The Insurer will pay the **Direct Net Ascertained** loss, up to the **Limit of Indemnity**
> suffered by the **Insured** directly resulting from the non-performance of the **Specific
> Contract** due to the **Insured Person's Failure to Survive** during the **Period of
> Insurance**

Policy at 10.  Whereas the 2016 Policy stated that HCC would pay the "**Direct Ascertained Net**

**Loss**," the Policy stated that it would pay the "**Direct Net Ascertained** loss"—swapping the

words "Net" and "Ascertained," and leaving "loss" uncapitalized and in regular, not bold, type.

*Compare* 2016 Policy at 8, *with* Policy at 10.  Second, the Policy defined "Direct Ascertained

Net Loss"—the same term that appeared in the 2016 Policy—as follows:

---

[3] The Policy covers $12,529,222, not the $12,529,922 originally discussed.  *See* Policy at 2.

> **Direct Ascertained Net Loss** means the amount remaining that the **Insured** is obliged to pay to satisfy its financial net loss obligation or incurs as a loss under the **Specific Contract** after subtracting all revenue and other value generated as the result of and/or during the time services were performed by the **Insured**

Policy at 10.  The main difference between that provision and the parallel one in the 2016 Policy is the omission of the word "Person" from the end of the sentence.  *Compare id.* ("performed by the **Insured**," *with* 2016 Policy at 7 ("performed by the **Insured Person**").

The Policy, which specified that "[w]ords in bold print in this Insurance have special meaning, as defined in the DEFINITIONS of this Insurance," defined "Insurer" to mean HCC, "Insured" to mean Roc Nation, and "Insured Person" to mean Feldstein and Levine, *id.* at 1, 9, 22.  Further, pursuant to HCC's earlier suggestion, the Policy stated, under "Information," that "[t]he specific contract referred to in this policy is the Purchase Agreement entered into as of the 14th Day of September, 2016, by and among Career Artist Management, Jordan Feldstein and Roc Nation."  *Id.* at 21.  It also stated that "all . . . documents and information provided by [Roc Nation]" were "incorporated into this insurance."  *Id.* at 9.

### 6.    Feldstein's Death

On December 22, 2017, Feldstein died.  JSF ¶ 57.  On December 23, 2017, Roc Nation notified Blackman of his death; the same day, Bretton Woods notified HCC.  *Id.* ¶¶ 59–60.  Over the next several months, HCC repeatedly pressed for access to the autopsy report of Feldstein, but Blackman advised that the Los Angeles coroner's office had not yet prepared one, and had stated that the earliest he could expect to receive such report would be late in March 2018.  *Id.* ¶¶ 62–65.  On March 15, 2018, the Los Angeles County Department of Medical Examiner issued a report finding that Feldstein had died of natural causes.  *Id.* ¶ 66.  On March 19, 2018, Bretton Woods sent a link to the report to HCC.  *Id.* ¶¶ 66–67.  On March 24, 2018, the Medical Examiner issued an official autopsy report consistent with the March 15 report.  *Id.*

After Feldstein's death, several artists he had managed either stayed with CAM or moved to Roc Nation. *See* JSF App'x, Ex. 53 ("May 30 Ltr.") at 2. Others, including Maroon 5 and Levine, left CAM and Roc Nation, but were the subject of a March 19, 2018 Termination Agreement between CAM, Roc Nation, their new manager, and others, under which CAM would, among other things, receive several million dollars during 2018. *See* Finch Decl., Ex. M ("Termination Agreement") § 3. Finally, some artists left CAM and Roc Nation altogether, without an agreement in place. *See* JSF App'x, Ex. 61 ("Aug. 13 Ltr.") at 3–4.

### 7.   Pre-Denial Investigation

On March 20, 2018, Blackman asked Alive Risk for everything HCC would need to receive in order to pay Roc Nation's claim. JSF ¶ 68. On March 24, 2018, Blackman told Alive Risk that Roc Nation was "demanding" that HCC identify the documents it needed, noting that "[t]his is getting extremely urgent." *Id.* ¶ 71. The same day, Alive Risk forwarded to Blackman HCC's response, which stated that, assuming the autopsy report was in order, it would "start to look at whether [Roc Nation] is likely to suffer a financial loss at all," and would need to see Roc Nation's CAM recoupment figures for 2016 and 2017, along with "budgeted recoupment figures for the forthcoming years." *Id.* ¶ 72.

On April 6, 2018, Roc Nation submitted its Proof of Loss to HCC. *Id.* ¶ 75; JSF App'x, Ex. 50 ("Proof of Loss"). In it, Roc Nation wrote that, although 2017 disbursements had not been made at the time of Feldstein's death, its anticipated annual disbursement of $1,554,945.88 "solely for purposes of resolving this claim, . . . reduce[d] its claim" by that amount. Proof of Loss at 1. It thus subtracted that amount from the policy limit of $12,529,222, estimating that its Direct Ascertained Net Loss was $10,974,277. *Id.* Adjusting that amount to present value based on its anticipated recoupment of its investment by October 2020, Roc Nation stated that it would settle its claim for $10,759,869, if paid by April 15, 2018. *Id.* at 1–2.

Between May 2 and August 20, 2018, HCC and its forensic accountants, Matson Driscoll & Damico LLP ("MDD"), sent Roc Nation six letters requesting information HCC stated was relevant to its investigation and calculation of Roc Nation's loss.  Roc Nation responded to each, although in many responses it noted certain relevancy objections, constraints on its ability to respond, or the unavailability of certain documents.  Because this correspondence is central to HCC's defense that Roc Nation failed to cooperate, the Court reviews it in some detail.

On May 2, 2018, HCC requested seven categories of information: (1) how Roc Nation had acquired three artists who had been associated with CAM; (2) "what happened to" Roc Nation's membership interest in CAM; (3) whether Roc Nation maintained an interest in CAM; (4) whether Roc Nation and CAM had dissolved their Purchase Agreement; (5) all information related to "the restructuring of CAM"; (6) medical information about Feldstein; and (7) all agreements referenced in the Purchase Agreement, along with supporting documents for each item.  JSF App'x, Ex. 51 ("May 2 Ltr.") at 8.

On May 7, 2018, MDD sent a letter to Roc Nation seeking 10 categories of information, including (1) "quarterly fee tail statements" for CAM and Roc Nation since the Purchase Agreement; (2) "trust detail" under the Purchase Agreement for the same period; (3) CAM's profit and loss ("P&L") statements for the same period; (4) general ledger detail showing all transactions between CAM and Roc Nation; (5) bank statements showing 2016 and 2017 distributions from CAM to Roc Nation; (6) the documents underlying Roc Nation's calculation, in its Proof of Loss, of its expected recoupment of its CAM investment; (7) Feldstein's employment agreement; (8) a list of former CAM artists now managed by Roc Nation; (9) all exhibits to the Purchase Agreement; and (10) all other information supporting Roc Nation's Proof of Loss.  *Id.*, Ex. 52 ("May 7 Ltr.").

11

On May 30, 2018, Roc Nation, through counsel, responded to MDD's letter.  *See* May 30 Ltr.  It answered most of the requests directly, including by producing the requested documents as exhibits to the letter.  *Id.* at 1–2.  But as to two, it resisted.  First, as to Roc Nation's support for its projected recoupment of its investment in CAM, Roc Nation stated that "[t]he individual who prepared that document is no longer with Roc Nation and at this time we have found no additional details on his thoughts in preparing that analysis."  *Id.* at 2.  Second, as to artists that had left CAM for Roc Nation since Feldstein's death, Roc Nation stated that the Policy "does not appear to allow for modification to the insurance loss for revenue following the date of death except in very limited circumstances."  *Id.*  Nonetheless, it identified six artists who remained managed either by CAM or Roc Nation, and three others—including Maroon 5 and all its individual members—who had left both.  *Id.*

On June 8, 2018, Roc Nation responded to HCC's May 2, 2018 letter, without objection. *Id.*, Ex. 54 ("June 8 Ltr.") at 1–2.  It noted that, as to CAM's "restructuring," Roc Nation had entered into an agreement "in relation to the departure of certain artists including Maroon 5," which was subject to a confidentiality provision, and that Roc Nation was seeking a release from its confidentiality obligations to produce the agreement.  *Id.* at 2; *see* Termination Agreement. Further, Roc Nation stated its understanding, unrelated to any specific request, that the Policy "benefit is unaffected by post-death items of revenue except in very limited circumstances," that it did not believe it had an "obligation to provide information outside of those exceptions," and that any information that Roc Nation did provide relevant to such revenue "should not be taken as an indication of relevancy.  June 8 Ltr. at 2.

On June 21, 2018, HCC responded, now also through counsel, noting its appreciation for Roc Nation's cooperation and setting forth 16 new requests.  Those were: (1) whether the

Purchase Agreement was still in effect; (2) an explanation of "what happened" to Feldstein's unvested interest in CAM; (3) an explanation of why CAM was "scaled down"; (4) all information and documents about Roc Nation's acquisition of any CAM artists; (5) where Maroon 5 had gone from CAM; (6) a copy of the Termination Agreement; (7) a HIPAA release from Feldstein's estate; (8) a revenue breakdown for CAM's 2016 and 2017 P&L statements; (9)–(12) explanations for certain calculations, and CAM's balance sheets; (13) income and expense projections for CAM since 2016; (14) all due-diligence documents from Roc Nation's purchase of Feldstein's shares of CAM; (15) all correspondence with CAM or Live Nation about revenue increases or expense decreases expected in 2018 or later; and (16) all correspondence with Feldstein about certain aspects of the Purchase Agreement. *Id.*, Ex. 55 ("June 21 Ltr.") at 2–3. As to Roc Nation's interpretation of the Policy's application to post-death revenue, HCC stated that Roc Nation had "misinterpreted how the policy is intended to apply," and asking Roc Nation to explain its position. *Id.* at 3.

On June 29, 2018, Roc Nation responded. *Id.*, Ex. 56 ("June 29 Ltr."). It answered most of HCC's most recent inquiries, reiterating that the Termination Agreement was subject to a confidentiality agreement, but that Roc Nation was working to be able to produce it. But as to requests 13 through 15—which concerned CAM's forecasted revenue and Roc Nation's due diligence from when it invested in CAM—Roc Nation denied that the information was "relevant to the resolution of the claim." *Id.* at 3. Even so, it provided a revenue forecast "that was created when purchasing the interest under the contract insured." *Id.* It also noted that this was its third response to HCC's letters "making lengthy information requests," and that there "must be limits and we must move this process to a prompt resolution." *Id.* at 4.

13

On July 13, 2018, HCC sent another round of requests, thanking Roc Nation for its continued cooperation and seeking 11 more categories of information. *See id.*, Ex. 57 ("July 13 Ltr."). This time, it sought: (1) an explanation for why Roc Nation had excluded certain former CAM artists that Roc Nation now managed from a previously provided breakdown of Roc Nation's revenue from such artists; (2) a detailed revenue breakdown for all former CAM artists who were now with Roc Nation; (3) CAM's 2018 P&L statement for its "legacy business"; (4)–(5) clarification of certain calculations; (6) a list of all acts that Feldstein had represented; (7) contact information for the executor or administrator of Feldstein's estate; (8) agreements with each artist released from CAM; (9) all agreements between Roc Nation and CAM that had not yet been produced; (10) all owners of "CAM LLC" and its articles of incorporation; and (11) whether Roc Nation had an interest in CAM LLC. *Id.* at 2–3.

On July 18, 2018, Roc Nation responded. *Id.*, Ex. 58 ("July 18 Ltr."). Again, it answered most of HCC's inquiries in full. As to the first, it stated that it had excluded certain artists from its revenue breakdown for prior CAM artists because they "brought in no commissionable revenue during" the relevant period. *Id.* at 1. As to the fourth through eleventh, it answered in full. *Id.* at 2–3. But as to the second and third—about revenue Roc Nation had received from former CAM artists and about CAM's 2018 P&L statement—Roc Nation maintained that such information was irrelevant to HCC's investigation. *Id.* at 1. It thus declined to provide that information and instructed HCC to proffer a theory of relevance if it continued to seek it.

On July 20, 2018, HCC sent a longer letter in response. *Id.*, Ex. 59 ("July 20 Ltr."). First, it explained its basis for believing that revenue generated by artists who had moved to Roc Nation from CAM after Feldstein's death, as well as other related revenue, was relevant to its loss calculation. *Id.* at 1–8. It argued that the Policy limited coverage to Roc Nation's Direct

14

Ascertained Net Loss, which required "subtracting all revenue and other value generated as the result of and/or during the time services were performed by the insured." *Id.* at 7 (quoting Policy at 10). Because there was no temporal limit on revenue generated "as the result of" Feldstein's services, HCC stated, all of Roc Nation's revenue traceable to Feldstein, before or after his death, must be deducted from its recovery. *Id.* In support, it noted that, under Roc Nation's interpretation, the Policy would risk granting Roc Nation a windfall if it continued reaping benefits from its ownership of CAM while also recouping most of its investment in CAM from HCC. *Id.* (citing $5 million payout to CAM likely to result from Termination Agreement between it and several artists). After so stating, HCC then requested the two categories of information outstanding from its prior letter, as well as nine new requests. *Id.* at 8–9. Those new requests included clarifications about prior correspondence, general ledger detail showing payments to Roc Nation in connection with the Termination Agreement, and, as relevant here, "any and all correspondence . . . between" Roc Nation and Feldstein's estate. *Id.*

On August 8, 2018, Roc Nation again responded. *Id.*, Ex. 60 ("Aug. 8 Ltr."). First, it set forth its opposing view as to the interpretation of the Policy's coverage. *Id.* at 1. Mainly, it noted that, because "[a]rtist relationships must be managed day-to-day," Feldstein's work before his death was causally disconnected from any revenue generated after it. *Id.* In fact, it stated, Roc Nation had suffered losses far exceeding the Policy's coverage limit once it took account of lost profits resulting from Feldstein's death. *Id.* Even so, it responded to the bulk of HCC's requests, while noting certain relevancy-based objections to several. *See id.* at 2–3. Only as to one—requesting all Roc Nation's correspondence with Feldstein's estate—did Roc Nation refuse to comply. *Id.* at 3. It stated, "[t]his request is overly-broad and does not appear to request information relevant to the settlement of this claim." *Id.*

On August 13, 2018, HCC wrote back, this time without any new requests. *See* Aug. 13 Ltr. Instead, it first catalogued the seven requests from its prior letters that it believed remained outstanding, and again sought Roc Nation's compliance. *Id.* at 2–3. Those were:

| Date of Request: | Request |
| --- | --- |
| 5.7.18 | 1. Details and documentation to the internal analysis of when Roe Nation predicted it would recoup its investment in CAM as demonstrated in Fig. 2 of the Proof of Loss. |
| 6.2.18 | 2. Provide all budgets/forecasts prepared in anticipation of income and associated expenses of CAM from 2016 through all dates prepared. |
| | 3. Provide all documentation secured and utilized in the due diligence of buying Mr. Feldstein's shares of CAM. |
| | 4. Provide all correspondence with CAM and/or Live Nation regarding expected increases in revenue or decreases in expenses in 2018 and thereafter. |
| 7.13.18 | 5. Provide a detailed revenue breakdown for all the above clients that remained with Roe Nation from January 2018 through the present. |
| | 6. Provide the detailed 2018 P&L for the remaining legacy CAM business detailing revenues and expenses. |
| 7.20.18 | 7. Please provide any and all correspondence whether written or via email and agreements, between the Insured and Feldstein's Estate. |

*Id.* HCC also stated again its interpretation of the Policy's coverage limit. *Id.* at 3. Last, it offered a partial payment, termed an "Undisputed Claim Amount." *Id.* at 4. Recognizing that certain artists had left CAM without moving to Roc Nation in the wake of Feldstein's death, and had not participated in the Termination Agreement, HCC stated that it was prepared to pay Roc Nation $1,176,595. *Id.* at 3–4. That amount, HCC claimed, represented the projected income

16

those artists would have generated for Roc Nation between Feldstein's death and the end of his employment contract in 2024, based on their pre-departure revenue, reduced to present value. *Id.*

On August 20, 2018, Roc Nation wrote its last letter to HCC before HCC would ultimately deny its claim. *Id.*, Ex. 62 ("Aug. 20 Ltr."). There, it stated that it had submitted extensive information in response to HCC's "unreasonably broad" requests, and had "only drawn the line when the requests [were] overtly irrelevant or not reasonably-tailored." *Id.* at 1. Thus, although it stated it would meet with HCC in person to seek a resolution, it did not provide any other responses or documents. *Id.* at 1–2. It also accepted HCC's offer of $1,176,595, on the understanding that such acceptance did not settle the rest of its claims or otherwise waive any rights. *Id.*

On September 21, 2018, Roc Nation and HCC representatives met at Roc Nation's offices in New York City, but they did not reach an agreement. JSF ¶¶ 80–81.

### 8.    Denial of Roc Nation's Claim

On September 28, 2018, HCC denied Roc Nation's claim in full. *Id.* ¶ 81; JSF App'x, Ex. 66 ("Denial"). In its Denial, HCC described the applicable Policy terms, Denial Ltr. at 1–7, pertinent events, *id.* at 8–9, and HCC and Roc Nation's correspondence through HCC's investigation, *id.* at 9–30. HCC then explained the basis for its denial.[4] First, it repeated its understanding, expressed in its July 20 letter, that Roc Nation's recovery must be reduced by any post-loss revenue that could be traced to CAM or Feldstein's services. *Id.* at 34–36. Second, it stated that Roc Nation's failure to provide certain requested information had "hindered HCC

---

[4] The Denial also identified other potential grounds for denying Roc Nation's claim, beyond those on which it expressly relied in the letter, and stated that it was reserving its rights with respect to those grounds.

from being able to complete its analysis" of the claim, and so "most importantly" denied the claim based on Roc Nation's alleged failure to cooperate. *Id.* at 41, 44.

### 9.     Post-Denial Correspondence and Events

Even after HCC's Denial, the parties continued working to settle the claim. *See, e.g.*, JSF App'x, Ex. 69 at 4 (HCC, through counsel, noting that, while "the claim remains denied," HCC "did agree to consider further information [Roc Nation] is willing to present"). They were unable to reach agreement.

On October 24, 2018, HCC emailed Blackman with requests, pared down "to the following 3 items": (1) monthly revenue, from January 2018 to present, for former CAM artists who remained with Roc Nation; (2) a 2018 P&L statement for CAM's remaining business or, if unavailable, monthly revenue and expense statements or general ledger excerpts for 2018 so far; and (3) general ledger detail related to the Termination Agreement.  JSF App'x, Ex. 68 at 2.  On November 1, 2018, Glen Silver, a partner at MDD, told Blackman that such information was necessary to determine Roc Nation's revenue attributable to Feldstein since Feldstein's death. *Id.*, Ex. 69 at 10.  Between then and November 6, 2018, Blackman discussed follow-on questions with HCC's counsel, but they, still, could not reach agreement. *Id.* at 3–8.

Negotiations between HCC and Roc Nation continued into December 2018, *see id.*, Exs. 70–72.  On December 10, 2018, in its last correspondence before litigation, HCC wrote to Blackman that it "simply cannot value the claim and have intelligent and thoughtful discussions without the information requested." *Id.*, Ex. 72 at 2; JSF ¶ 84.  Roc Nation's claim remains denied.  JSF ¶ 85.

On January 16, 2019, Roc Nation received transfers from CAM in the amount of $7,035,001.  First Vogrin Decl., Ex. F ("Revenue Detail") at 9–10.  Roc Nation's records state that those transfers reflect "[r]eceipt of 49% of CAM 2018 P&L and M5 Settlement."  *Id.*[5]

### B.    Procedural History

On January 18, 2019, Roc Nation filed the Complaint.  Dkt. 1.  On March 22, 2019, HCC answered, counterclaimed, and filed a partial motion to dismiss as to Roc Nation's claim for breach of the implied covenant of good faith and fair dealing.  Dkts. 11–14.  On April 12, 2019, Roc Nation filed the FAC and answered HCC's counterclaim.  FAC; Dkt. 19.

On May 3, 2019, HCC answered the FAC, renewed its Counterclaim, and renewed its partial motion to dismiss.  Answer; Counterclaim; Dkts. 21–23.  On May 17, 2019, Roc Nation answered HCC's renewed Counterclaim.  Dkt. 26.  On July 11, 2019, the Court, in a ruling from the bench, denied HCC's partial motion to dismiss without prejudice.  Dkt. 40.

On September 6, 2019, Roc Nation sought leave to move for early summary judgment, Dkt. 45, which HCC opposed, Dkt. 50, and the Court denied, Dkt. 52.

On June 17, 2020, after a long and fractious period of discovery, the Court held a pre-motion conference to discuss the parties' anticipated motions for summary judgment.  Dkt. 208

---

[5] As to this document, in a submission containing evidentiary objections to HCC's Local Rule 56.1 statement, Roc Nation summarily objects that "HCC fails to authenticate or identify that the document states what HCC claims as required by FRE 901."  RN Objections ¶¶ 2–3.  As to authenticity, Roc Nation itself produced this document, which bears a Roc Nation bates stamp and does not suggest any reason to doubt its authenticity.  In such circumstances, Roc Nation "cannot credibly question" its authenticity under Federal Rule of Evidence 901.  *Tr. of Local 8A-28A Welfare Fund v. Am. Grp. Adm'rs.*, No. 14 Civ. 1088 (RRM) (PK), 2017 WL 3700899, at *2 (E.D.N.Y. Aug. 25, 2017); *see Faulkner v. Arista Recs. LLC*, 797 F. Supp. 2d 299, 307 (S.D.N.Y. 2011) (where "Plaintiffs produced the documents and are thus in the best position to know whether they are indeed authentic," argument that document may be inauthentic "teeters on the edge of sanctionable").  As to the document's contents, the document speaks for itself, and is consistent with HCC's characterization of it.

("Conf. Tr."). At that conference, all agreed that resolution of two discrete issues on summary judgment would significantly aid the parties in settling, and the Court in trying, this action. *Id.* at 8–15.

On July 20, 2020, the parties filed the JSF, accompanied by a large appendix of exhibits supporting stipulated facts. *See* JSF; JSF App'x. On August 10, 2020, HCC filed a motion for summary judgment on its defense of noncooperation and its interpretation of the coverage at issue, Dkt. 170; a memorandum of law in support, Dkt. 173 ("HCC Mem."); a Local Rule 56.1 Statement, HCC 56.1; and the first declaration of George J. Vogrin, Esq.

On August 31, 2020, Roc Nation cross-moved for partial summary judgment, Dkt. 179, and filed a memorandum of law in support, Dkt. 181 ("RN Mem."); a Local Rule 56.1 Statement, RN 56.1; a counter-statement to HCC's Local Rule 56.1 Statement, RN Reply 56.1; evidentiary objections to HCC's Local Rule 56.1 Statement, RN Objections; and the declaration of Amber Finch. Roc Nation also filed a notice of errata, providing a corrected exhibit and citations in the JSF and JSF Appendix. Dkt. 177.

On September 14, 2020, HCC filed a memorandum of law opposing Roc Nation's cross-motion for partial summary judgment and replying in further support of its own motion, Dkt. 196 ("HCC Resp."); a counter-statement to Roc Nation's Local Rule 56.1 Statement, HCC Reply 56.1; and the second declaration of Mr. Vogrin.

On September 28, 2020, Roc Nation replied in further support of its motion for summary judgment. Dkt. 202 ("RN Reply").

## II.    Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The

movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III.   Discussion

### A.   Roc Nation's Cooperation with HCC's Investigation

HCC argues that it was justified in denying Roc Nation's claim, and that Roc Nation's lawsuit therefore must be dismissed, because Roc Nation obstructed, rather than cooperated with, HCC's investigation of Roc Nation's claim. Roc Nation responds that the undisputed facts show that it substantially complied with HCC's investigation—and that it declined to provide records

of answers to HCC's questions only where it believed in good faith that HCC's requests were immaterial or irrelevant, or where the requested information was unavailable.

The Court holds with Roc Nation.  Roc Nation complied with the overwhelming majority of HCC's requests, and offered reasonable justifications when it failed to do so.  HCC has not met—or come close to meeting—its heavy burden of showing that noncooperation by Roc Nation bars its claim.  Accordingly, the Court denies HCC's motion for summary judgment, and grants Roc Nation's mirror-image motion, as to this defense.

### 1.    Applicable Legal Standards

Under the Policy, "[a]ny payments under this Insurance will only be made if [Roc Nation] cooperate[s] with [HCC] in the investigation of any claim or incident leading to a claim."  Policy at 13.  HCC argues that Roc Nation breached this obligation so as to warrant entry of judgment in its favor on Roc Nation's claims and a finding that several of HCC's affirmative defenses liability apply.

Under New York law, "the failure of an insured to cooperate with the insurer in its investigation of a claim constitutes a material breach of the contract of insurance, and is a defense to a suit by the insured on the policy."  *Evans v. Int'l Ins. Co.*, 168 A.D.2d 374, 374 (1st Dep't 1990).  However, an insurer invoking this defense faces a "very heavy burden." *N.Y. Cent. Mut. Fire Ins. Co. v. Salomon*, 11 A.D.3d 315, 316 (1st Dep't 2004) (citation omitted); *see Staten Island Supply Co. v. Lumbermens Mut. Cas. Co.*, No. 02 Civ. 6390 (DGT), 2005 WL 711678, at *7 (E.D.N.Y. Mar. 29, 2005) ("Forfeiture of the right to recover on an insurance contract is an extreme remedy for the court to impose.").  To deny coverage on this basis, an insurer must show: (1) "that it acted diligently in seeking to bring about the insured's cooperation"; (2) "that the efforts employed by the insurer were reasonably calculated to obtain the insured's co-operation"; and (3) "that the attitude of the insured, after [its] co-operation was

sought, was one of willful and avowed obstruction." *Thrasher v. U.S. Liab. Ins. Co.*, 19 N.Y.2d 159, 278 (1967) (citation omitted).

The parties' dispute centers on the third element, and thus focuses on Roc Nation's actions and attitude.[6] That element "may be established by an insurer's showing that its insured 'engaged in an unreasonable and willful pattern of refusing to answer material and relevant questions or to supply material and relevant documents.'" *DeLuca v. RLI Ins. Co.*, 187 A.D.3d 709, 721 (2d Dep't 2020) (citation omitted)). "When the insured's failure to fulfill his obligations under an insurance policy 'is indicative of a pattern of non-cooperation for which no reasonable excuse for noncompliance has been proffered,' his conduct is properly deemed willful." *Rosenthal v. Prudential Prop. & Cas. Co.*, 928 F.2d 493, 494–95 (2d Cir. 1991) (quoting *Bulzomi v. N.Y. Cent. Mut. Fire Ins. Co.*, 92 A.D.2d 878, 878 (2d Dep't 1983)) (collecting cases). Thus, refusing to answer or provide "material and relevant" questions or documents, absent a "reasonable excuse," can qualify as "willful and avowed obstruction." *Id.* at 494–95; *DeLuca*, 187 A.D.3d at 721.

However, "the duty of an insured to cooperate with the insurer is satisfied by substantial compliance." *DePicciotto Corp. v. Wallis*, 177 A.D.2d 327, 328 (1st Dep't 1991); *see V.M.V. Mgmt. Co. v. Peerless Ins.*, 15 A.D.3d 647, 648 (2d Dep't 2005) (collecting cases). "Thus, in construing the cooperation clause, the New York Court of Appeals has held that 'a breach which will defeat a recovery cannot be based upon technical or unimportant omissions or defects in the

---

[6] As to other elements, Roc Nation notes, without argument, that HCC did not make its first requests for information until May 2018. RN Mem. at 6. But Roc Nation did not submit its Proof of Loss until April 2018, and Feldstein's autopsy report was not issued until March 2018. *See* JSF ¶¶ 66–67, 75. After Roc Nation's submission, HCC acted promptly and, as recounted above, thoroughly in exploring Roc Nation's claim and seeking its cooperation.

performance by either party.'"  *C-Suzanne Beauty Salon, Ltd. v. Gen. Ins. Co. of Am.*,

574 F.2d 106, 110 (2d Cir. 1978) (quoting *Porter v. Traders' Ins. Co.*, 164 N.Y. 504, 509

(1900)).  But that does not allow an insured to "pick and choose which information to provide,"

or allow "that the failure to provide some information could be rendered immaterial by providing

other information."  *Richie's Corner, Inc. v. Nat'l Specialty Ins. Co.*, 598 F. Supp. 2d 274, 277

(E.D.N.Y. 2008).  Further, "the insurer need not show prejudice as a result of the lack of

cooperation of its insured to be entitled to summary judgment."  *GuideOne Specialty Mut. Ins.*

*Co. v. Congregation Bais Yisroel*, 381 F. Supp. 2d 267, 276 (S.D.N.Y. 2005) (citing *Utica Mut.*

*Ins. Co. v. Gruzlewski*, 217 A.D.2d 903, 904 (4th Dep't 1995) (collecting cases)); *see Coleman v.*

*New Amsterdam Cas. Co.*, 247 N.Y. 271, 277 (1928).[7]

## 2. Application

Although HCC's position has a degree of force, it has not met its "very heavy burden,"

*Salomon*, 11 A.D.3d at 316, to show that Roc Nation was uncooperative enough to preclude its

claim.  Rather, viewing HCC's extensive investigation into Roc Nation's claim as a whole, Roc

---

[7] Roc Nation argues that a showing of prejudice is necessary, but the sole case it cites in support, *Nat'l Union Fire Ins. Co. of Pittsburgh v. Stroh Cos.*, 265 F.3d 97, 114 (2d Cir. 2001), does not so require.  *Stroh* instead noted that the insurer's requests there were expressly contingent on its accepting coverage.  *Id.*  The Circuit held that, because the insurer did not, in fact, accept coverage, the failure of the insured to comply with the insurer's requests did not defeat his claim.  *Id.*  The Circuit's brief treatment of this issue, although using the word "prejudice," is not fairly read more broadly to incorporate a freestanding prejudice requirement into all noncooperation defenses.  And there is substantial countervailing state law to the contrary.  *See, e.g.*, *Allstate Ins. Co. v. United Int'l Ins. Co.*, 16 A.D.3d 605, 606 (2d Dep't 2005) ("Contrary to the plaintiffs' contentions, the defendant was not required to show prejudice as a result of Rafferty's lack of cooperation."); *Atl. Mut. Ins. Co. v. Struve*, 210 A.D.2d 112, 114 (1st Dep't 1994) ("Nor . . . is an insurer required to show prejudice as a result of the insured's lack of cooperation."); *Burlington Ins. Co. v. Sublink Ltd.*, Index No. 655105/2019, 2020 WL 1991337, at *4 (N.Y. Sup. Ct. Apr. 3, 2020) ("[A]n insurer is not required to establish prejudice due to noncooperation before it may disclaim.").

Nation's conduct reflected substantial if imperfect compliance with, and nowhere near willful and avowed obstruction of, HCC's investigation.

Beginning with HCC's first requests in May 2018, Roc Nation spent months supplying HCC with copious information about its business, revenue, relationship with CAM, and other finances, in response to ever-multiplying inquiries. Before HCC denied its claim, Roc Nation produced, among things: CAM's P&L statements for 2016 and 2017, *see* RN 56.1 ¶ 4; CAM's balance sheets for 2016 and 2017, *see id.*; all general-ledger account detail for activity between Roc Nation and CAM, *see id.*; documentation of all prior distributions from CAM to Roc Nation, *see* May 30 Ltr. at 1; a list of all artists who CAM or Roc Nation continued to manage after Feldstein's death, *see id.* at 2; a forecast of CAM's projected income from 2016, when Roc Nation bought its stake in CAM, *see* June 29 Ltr. at 3; a breakdown of CAM's monthly revenue by client from 2016 through Feldstein's death, *see id.* at 2; RN 56.1 ¶ 4; and a copy of the Termination Agreement (once Roc Nation secured a release from its confidentiality provision), *see* RN 56.1 ¶ 4; *see also* HCC Reply 56.1 ¶ 4 (disputing only whether Roc Nation supplied "all ancillary documents referenced in the Purchase Agreement").

For many categories of information, Roc Nation provided documents and answers even while registering its disagreement that the requested materials were relevant to its claim or the investigation. *See, e.g.*, May 30 Ltr. at 2 (providing list of artists still managed by CAM or Roc Nation, while noting that "the Insurance Contract does not appear to allow for modification to the insurance loss for revenue following the date of death except in very limited circumstances"); Aug. 8 Ltr. at 2–3 (objecting that general-ledger detail about the 2018 Termination Agreement and other CAM transactions was irrelevant, but providing two schedules in response).

All in all, HCC propounded 53 separate requests or questions, of which it has conceded Roc Nation satisfied all but seven. *See* Aug. 13 Ltr. at 2–3 (noting seven outstanding requests); *see supra* p. 16.  For six of those, Roc Nation contemporaneously objected on grounds that the requests were irrelevant, given its understanding of the Policy coverage, and seeking a proffer of relevance from HCC before complying.[8]  *See* June 29 Ltr. at 3–4 (objecting to requests for forecasted CAM revenue, due-diligence documents from Roc Nation's 2016 purchase of CAM shares, and projected 2018 revenue increases, while noting that such information "will be provided if a showing of relevancy is made"); July 18 Ltr. at 1 (objecting to request for 2018 revenue breakdown and P&L and asking, "to the extent your client is taking the position that post-death revenue, expense, and/or projections are relevant, we ask that they identify in what circumstances they believe them to be so and how those positions would affect any loss calculation under that theory"); Aug. 8 Ltr. at 3 (request for all correspondence between Roc Nation and Feldstein's both overbroad and irrelevant).  And despite these objections, Roc Nation, for at least two of the requests that HCC claimed were unmet, provided some responsive information.  *See* June 29 Ltr. at 4 (objecting that budget forecasts from 2016 onward were

---

[8] As to the seventh, Roc Nation denied possessing the data underlying its recoupment projection in its Proof of Loss, because the person who had prepared the Proof of Loss was no longer with Roc Nation and Roc Nation had been unable to locate the documentation on which he relied. May 30 Ltr. at 2.  Later, Roc Nation's CEO, Desiree Perez, testified that she and her attorney, who had represented Roc Nation throughout its negotiations with HCC, had prepared the Proof of Loss.  *See* Second Vogrin Decl., Ex. P ("Perez Tr.") at 147 ("I think my participation is on the projections that were provided on the proof of loss statement.").  HCC argues that her admission shows that Roc Nation had dissembled in saying that the person who prepared the Proof of Loss was gone.  HCC Resp. at 4.  But Perez explained on the next page of her deposition testimony that she had received the recoupment data from Roc Nation's accounting department, not that she generated or had access to it herself.  *See* Dkt. 220-4 at 148.  That is consistent with Roc Nation's representation in its May 30 letter.  Even if Roc Nation were found to have negligently failed to produce such data, on the theory that it had possessed but failed to locate it, that misstep would not outweigh Roc Nation's substantial compliance with HCC's requests.

irrelevant but providing the forecast "that was created when purchasing the interest under the contract insured"); *id.* (objecting that requested correspondence about whether CAM expected a revenue increase in 2018 was irrelevant to the claim, but explaining that Maroon 5, which generated 72% of CAM's revenue in 2017, had left CAM for another manager).

On July 20, 2018, HCC responded to Roc Nation's request for an explanation of why it considered post-death revenue to be relevant.[9]  In that letter, HCC for the first time[10] articulated its view that any revenue generated by artists who had migrated from CAM to Roc Nation after Feldstein's death, as well as any money Roc Nation received from the Termination Agreement, was to be deducted from Roc Nation's loss under the Policy.  *See* July 20 Ltr. at 1–8.  That was because, HCC contended, the Policy required the subtraction from any loss all revenue generated "as the result of and/or during the time services were provided" by Feldstein.  *Id.* at 7.  But on August 8, 2018, Roc Nation responded with its competing interpretation.  It argued that post-death revenue that it received was irrelevant because it was not causally connected to Feldstein's management services, given that "[a]rtist relationships must be managed day-to-day."  Aug. 8 Ltr. at 1; *see also id.* at 2–3 (continuing to answer majority of nine new questions or requests for information).  That fundamental disagreement as to the Policy's scope remains at the center of the parties' dispute to this date.  As reflected in the competing motions for summary judgment,

---

[9] HCC does not appear to have explained the relevance of the requested due-diligence materials or Roc Nation's correspondence with Feldstein's estate.  In its response to Roc Nation's summary judgment motion, it conclusorily states that "[t]hese documents were necessary to HCC's understanding of this intricate business transaction and any loss incurred," HCC Resp. at 10–11, but it did not say so in 2018 when it denied Roc Nation's claim, and such would not have justified the denial.

[10] Previously, HCC had asserted that "Roc Nation has misinterpreted how the policy is intended to apply" in response to Roc Nation's objections regarding post-death revenue.  June 21 Ltr. at 3. But that earlier communications did not explain why that was so.

HCC maintains that all CAM-related income that Roc Nation received in 2018 or later must count against Roc Nation's loss, while Roc Nation argues that its loss is to be calculated solely based on its receipts from CAM-related business before Feldstein's death.

HCC briefly argues that Roc Nation also obstructed HCC's investigation by telling it that Feldstein's estate, not Roc Nation, was the proper party to address any HIPAA releases on Feldstein's behalf. *See* HCC Mem. at 13; June 29 Ltr. at 2; July 18 Ltr. at 3. In support, HCC suggests that the executor of Feldstein's estate represented, after HCC contacted him, that he would provide HCC with information only if Roc Nation requested it. *See* HCC Mem. at 13. But HCC's only evidence on this point is inadmissible hearsay, *see* Fed. R. Civ. P. 56(c)(2), and, in any event, does not show obstruction. HCC's investigator, Paul Gilbert, testified that he contacted the executor of Feldstein's estate, Paul Bernstein, and that Bernstein had been communicating with Roc Nation about the investigation. *See* First Vogrin Decl., Ex. G ("Gilbert Tr.") at 65–66. But in the email to HCC about which he was questioned, Gilbert recounts only what Bernstein said to him, and only that Bernstein was "waiting to hear more from them [Roc Nation] before he proceeds"—not that Roc Nation had so instructed him. Gilbert Tr., Ex. 10. At his deposition, Gilbert vaguely testified that Bernstein "reference[d]" his discussions with Roc Nation "as a requirement in terms of him communicating with me or providing any information." Gilbert Tr. at 65–66. But, again, that testimony is inadmissible hearsay, because HCC offers it for the truth of the matter asserted by out-of-court declarant Bernstein to Gilbert. And it is further problematic because Bernstein's statement, as hazily recounted by Gilbert, does not, without more, show obstruction. It does not equate to a statement that Roc Nation in any way had limited Bernstein's cooperation, or that Roc Nation, aiming to deny HCC Feldstein's medical records, misdirected HCC to executor Bernstein to handle HCC's request for such

28

records.  *See* June 29 Ltr. at 2.  On its face, it reveals, at most, Bernstein's hesitation to produce materials to HCC without first consulting with Roc Nation.  That does not reveal anything about Roc Nation's actions, motivations, or decision-making.

Thus, when HCC denied Roc Nation's claim, nearly every one of the few, unresolved requests remained open because of the parties' differing interpretations of the Policy and, as a result, of the information that was relevant to calculating Roc Nation's loss.  HCC therefore is incorrect in stating that Roc Nation did not supply an excuse for its decision not to provide some limited categories of requested information.  *See, e.g.*, HCC Resp. at 8; *see also Rosenthal*, 928 F.2d at 495 (preclusion appropriate where failures are "indicative of a pattern of non-cooperation *for which no reasonable excuse for noncompliance has been proffered*" (emphasis added) (quoting *Bulzomi*, 92 A.D.2d at 878)); *Davis v. Allstate Ins. Co.*, 204 A.D.2d 592, 594 (2d Dep't 1994) (precluding insured's claim where "[t]he record shows a pattern of noncooperation for which no reasonable excuse was offered").  That HCC disagreed with Roc Nation as to the relevance of certain documents does not make Roc Nation's noncompliance on those grounds unreasonable. *See, e.g.*, *Fold-Pak Corp. v. Liberty Mut. Fire Ins. Co.*, 784 F. Supp. 49, 60 (W.D.N.Y. 1992) (noting absence of cases dismissing insured's lawsuit where "the insured failed to provide documentation based on a reasonable, albeit mistaken, interpretation of the insurance policy"); *cf. Varda, Inc. v. Ins. Co. of N. Am.*, 45 F.3d 634, 640 (2d Cir. 1995) (no preclusion for noncooperation in part because of "the policy's fuzzy language" as to requirements of cooperation clause).  And, as reviewed below, Roc Nation's position on the materiality of post-death revenue, far from being unreasonable, was correct.[11]

---

[11] Contrary to HCC's suggestion, Roc Nation's statement that it "might be convinced that accounts receivable generated by Mr. Feldstein paid after the date of his death but fully-earned"

To be sure, Roc Nation's cooperation was imperfect.  Especially as the investigation dragged on, it occasionally chose confrontation and resistance over compliance or negotiation. For example, while at some points Roc Nation provided disputed information notwithstanding its relevancy objections, *see, e.g.*, Aug. 8 Ltr. at 2–3, at others, it categorically refused to provide information that it, however reasonably, deemed outside the scope of the investigation, *see, e.g.*, July 18 Ltr. at 1.  Roc Nation appears to have gained little by staking out so firm a position at these moments.  *See* RN 56.1 ¶¶ 5, 7.  The Policy's terms were less than pellucid—indeed, Roc Nation now asserts that they are ambiguous, *see, e.g.*, RN Mem. at 14; RN Reply at 8–9— leaving room for both sides to make responsible arguments as to the proper methodology for calculating Roc Nation's loss.  Both parties' unwavering positions during the claims investigation that their position alone was defensible were regrettably inflexible, and appear to have spawned discord that could been avoided had each candidly acknowledged at the outset that the Policy's textually problematic loss definition left room for honest debate.

In the end, as to the vast majority of HCC's many—and proliferating—requests for information, Roc Nation cooperated fully.  And where it did not, it made clear that its basis for not producing information was its reasonable and good-faith disagreement with HCC as to the Policy's methodology for calculating its loss, and its view that HCC was overreaching and delaying payment to which Roc Nation was entitled.  *See* Aug. 20 Ltr. at 1–2; Aug. 8 Ltr. at 3–4; *see also SCW W. LLC v. Westport Ins. Corp.*, 856 F. Supp. 2d 514, 528–29 (E.D.N.Y. 2012)

---

by performance before his death does not undermine the reasonableness of its position as to the information it did not provide.  Aug. 8 Ltr. at 1; *see* HCC Resp. at 9.  HCC's outstanding requests at the time of its denial did not concern such revenue.  Instead, these related either to revenue generated by CAM-affiliated artists who signed with Roc Nation after Feldstein's death, or to Roc Nation's separate negotiations, culminating in the Termination Agreement, after Feldstein passed away.  *See* Aug. 13, 2018 Ltr. at 2–3; Denial at 29–30.

("[W]hen evaluating an insurer's rights to investigation of a claim," and the reasonableness of an insured's cooperation with it, "the courts attempt[] to balance the insurer's legitimate interest in ascertaining the validity and extent of the claim against the insured's . . . rights to both privacy and prompt payment of sums due under the terms of the contract." (quoting *Fla. Gaming Corp. v. Affiliated FM Ins. Co.*, 502 F. Supp. 2d 1257, 1261 (S.D. Fla. 2007))); *V.M.V. Mgmt.*, 15 A.D.3d at 647 (denying insurer's motion for summary judgment based on noncooperation where insurer failed to show that unproduced materials were "material and relevant to the investigation or settlement of this claim").  On the undisputed facts, HCC therefore has not met its very heavy burden of showing that Roc Nation's conduct amounted to the willful, deliberate, and unexcused noncompliance that has led courts in rare circumstances to preclude the entirety of an insured's claim.  *See, e.g.*, *N.Y. Cent. Mut. Fire. Ins. Co. v. Rafailov*, 41 A.D.3d 603, 604–05 (2d Dep't 2007) (insured defied court-ordered disclosure demands and "failed to offer a satisfactory explanation" for noncompliance); *Davis*, 204 A.D.2d at 594 (insured offered shifting and inconsistent grounds for refusing to produce information, and adduced no evidence to show cooperation with insurer's investigation); *Cabe v. Aetna Cas. & Sur. Co.*, 153 A.D.2d 653, 653 (2d Dep't 1989) (insured agreed to provide material information to insurer and then, without excuse, failed to produce *any* information).

Accordingly, as to HCC's defense of noncooperation, the Court denies HCC's motion for summary judgment, and grants Roc Nation's motion.

## B.      Interpretation of Policy Coverage

The parties dispute how to calculate Roc Nation's loss under the Policy in two respects. First, they dispute whether HCC has met its burden in seeking reformation of the Policy, to address what it deems scrivener's errors that HCC made when drafting the Policy in 2017. Second, and more consequentially, they disagree—with or without HCC's proposed

31

reformation—as to the proper loss calculation under the Policy.  HCC contends that the Policy unambiguously requires the deduction from Roc Nation's loss any post-death revenue connected in any way to CAM or Feldstein.  Roc Nation argues that the Policy, considering the agreement between Roc Nation and CAM that it incorporates, and, if necessary, considering extrinsic evidence of the intentions of HCC and Roc Nation, entitles it to the full coverage amount set forth in the Policy less only those amounts that Roc Nation had recouped from CAM before Feldstein died.  The Court addresses these disputes in turn.

### 1.     Reformation

A party seeking reformation of a contract must show, by clear and convincing evidence, either a mutual mistake or a fraudulently induced unilateral mistake.  *Imrie v. Ratto*, 145 A.D.3d 1358, 1360 (3d Dep't 2016); *see Healy v. Rich Prods. Corp.*, 981 F.2d 68, 73 (2d Cir. 1992) (party must overcome a "heavy presumption" that agreement "manifests the true intention of the parties" (alteration omitted) (quoting *George Backer Mgmt. Corp. v. Acme Quilting Co.*, 46 N.Y.2d 211, 219 (1978))).  "A mutual mistake occurs when both parties to a bilateral transaction share the same erroneous belief and their acts do not in fact accomplish their mutual intent."  *Healy*, 981 F.2d at 73 (citation omitted).  "Thus, reformation will be granted to an insurer who establishes that its insured knew or should have known of an obvious scrivener's mistake in the policy."  *Loyalty Life Ins. Co. v. Fredenberg*, 214 A.D.2d 297, 299 (3d Cir. 1995); *see George Backer*, 46 N.Y.2d at 219 (reformation to be granted "when the writing that memorializes that agreement is at variance with the intent of both parties").  "Parol evidence is admissible to correct a mutual mistake."  *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Ams.*, No. 04 Civ. 10014 (PKL), 2005 WL 1950116, at *4 (S.D.N.Y. Aug. 12, 2005).

HCC seeks to reform two aspects of the Policy, each to match parallel terms from the 2016 Policy.  First, it argues that, under the Cover section, the Policy should state that HCC must

pay the "**Direct Ascertained Net Loss**," as provided in the 2016 Policy and as defined elsewhere in the Policy, rather than the undefined term "**Direct Net Ascertained** loss," which appears nowhere else in either.  Second, it argues that, in the definition of "**Direct Ascertained Net Loss**," the last sentence should end with the term "**Insured Person**," meaning Feldstein, not just "**Insured**," which would refer to Roc Nation.  As to both, HCC argues that, in 2017, it and Roc Nation clearly intended to renew the 2016 Policy on substantively identical terms; that the original 2016 Policy contained the terms as HCC seeks to reform them; that the divergences in the Policy are mere typographical errors; and that the Policy makes sense only if reformed in this way.  Roc Nation counters that any mistake in the Policy resulted solely from HCC's unilateral mistake.  *See* Finch Decl., Ex. AA ("Keoshgerian Tr.") at 44 ("[HCC] drew up the initial terms and conditions and discussed it with Bretton Woods.").

On this point, the Court holds with HCC.  It is clear that, in 2017, both Roc Nation and HCC sought renewal of the 2016 Policy on the same substantive terms as the first policy, subject only to changes in the amount of coverage.  In 2017, Roc Nation, through its broker, requested that Alive Risk "explore renewal" of the 2016 Policy.  JSF ¶ 24; *see* JSF App'x, Ex. 20 ("JSF Blackman Tr.") at 190 (Q. "You were looking for the same policies; correct? A. Yes.").  Bretton Woods informed HCC that it had been asked to "explore the option to renew the attached policy," and specifically requested "the same coverage as last year if possible?"  JSF ¶¶ 25–27.  Then HCC, in sending a near-final draft of the Policy to Bretton Woods, stated that, although it had altered the "old wording . . . [,] [t]here is no material change to the cover."  *Id.* ¶ 40.  Roc Nation does not contend that it understood the Policy to do anything but renew the 2016 Policy.

It is also undisputed that the 2016 Policy provided that "[t]he insurer will pay the **Direct Ascertained Net Loss**," 2016 Policy at 8, and that the last words of the 2016 Policy's definition

of Direct Ascertained Net Loss were "**Insured Person**," referring to Feldstein, not Roc Nation, *id.* at 7.  HCC's Keoshgerian testified, without contradiction, that the only reason the Policy did not match these terms was his own "[h]uman error" in omitting a word while copy-and-pasting the definition of Direct Ascertained Net Loss, and placing other words "in the wrong order." Keoshgerian Tr. at 209–10.  And, in fact, elsewhere in the Policy, HCC's payment obligation is defined to turn on Roc Nation's "**Direct Ascertained Net Loss**," not "**Direct Net Ascertained** loss."  *See* Policy at 12 ("[T]he **Insurer** will pay the **Insured** the **Direct Ascertained Net Loss** the **Insured** has suffered, up to the **Limit of Indemnity**.").

Notably, Roc Nation does not posit that the jumbled terms in the unreformed Policy have a distinct meaning that it understood, but HCC misread, at the time of bargaining.  Instead, it simply argues that they are ambiguous and "nonsensical."  RN Mem. at 14; RN Reply at 8–9. Although it cites several cases holding that a unilateral mistake does not support reformation, *see* RN Mem. at 15–16, it does not offer evidence to contradict HCC's substantial showing that, in fact, the mistake was mutual.  Rather, every indication is that, despite both parties' intent to reprise the same coverage and Direct Ascertained Net Loss terms as included in the 2016 Policy, "their acts [did] not in fact accomplish their mutual intent."  *Healy*, 981 F.2d at 73.

HCC has thus presented clear and convincing evidence of the parties' mutual mistake, sufficient to overcome the "heavy presumption" that the Policy reflects the parties' true intentions.  *Id.*  The Court will therefore reform the Policy to reflect their mutual aim.  *Id.*  In interpreting that agreement, the Court will construe the Cover term at page 10 of the Policy to state, "**Direct Ascertained Net Loss**," instead of **"Direct Net Ascertained** Loss," and the definition of Direct Ascertained Net Loss on the same page to include the term "**Insured Person**" at the end of the definition, instead of merely "**Insured**."

34

### 2.    Analysis of Policy Terms

The Court next turns to the parties' dispute over the proper interpretation of the terms of the Policy, as reformed.  Under the Policy, HCC agreed to pay Roc Nation its Direct Ascertained Net Loss, up to the limit of $12,529,222.  Policy at 2, 10.  Direct Ascertained Net Loss, in turn, is defined, as reformed, to mean Roc Nation's "loss under the **Specific Contract** [*i.e.*, the Purchase Agreement] after subtracting all revenue and other value generated as the result of and/or during the time services were performed by" Feldstein.  *Id.* at 10.

The parties' dispute turns on the interpretation of the latter definition—specifically, whether it allows HCC to subtract, from the $12,529,222 policy limit, revenue received by Roc Nation from CAM, or artists who were formerly affiliated with CAM, after Feldstein's death. HCC contends that the definition unambiguously allows it to do so.  Roc Nation argues that the definition, standing alone, is far from clear, but that, in light of the entire integrated insurance contract (and, if necessary, extrinsic evidence), HCC cannot subtract such amounts.

### a.    Principles for Interpreting Insurance Policies Under New York Law

The Policy—the only contract at issue—is governed by New York law.  *See* Policy at 4. Under New York law, "[t]he construction of an insurance contract is ordinarily a matter of law to be determined by the court."  *U.S. Underwriters Ins. Co. v. Affordable Hous. Found., Inc.*, 256 F. Supp. 2d 176, 180 (S.D.N.Y. 2003) (citing *Town of Harrison v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 89 N.Y.2d 308, 316 (1996)).  In resolving a summary judgment motion involving contract interpretation, "a court should accord [contract] language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish."  *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006) (quoting *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990)).

35

When contract language is unambiguous, the court may "construe it as a matter of law and grant summary judgment accordingly." *Id.* But where policy language is ambiguous, the ambiguities must be construed in favor of the insured and against the insurer. *See Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 201 (2d Cir. 2010); *Handelsman v. Sea Ins. Co.*, 85 N.Y.2d 96, 101 (1994) ("Where there is ambiguity as to the existence of coverage, doubt is to be resolved in favor of the insured and against the insurer.").

Whether a contract is ambiguous is a threshold question of law for the Court. *Real Est. Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006). Contract terms are ambiguous if they are "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (citation omitted).

Where an insurance policy's language is ambiguous, the court should examine the language "from the vantage point of the reasonable expectations and purposes of the ordinary person." *Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691, 695 (2d Cir. 1988) (cleaned up). The court should also "consider extrinsic evidence submitted by the parties to assist in determining their actual intent." *McCostis v. Home Ins. Co. of Ind.*, 31 F.3d 110, 113 (2d Cir. 1994). "If the extrinsic evidence does not yield a conclusive answer as to the parties' intent, it is appropriate for a court to resort to other rules of construction, including the contra-insurer rule, which states that any ambiguity in an insurance policy should be resolved in favor of the insured." *Id.*; *see Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 88 n.7 (2d Cir. 2002) ("[U]nder New York law, courts should not resort to *confra proferentum* until after consideration of extrinsic

evidence.").  "A New York court interpreting an insurance contract whose meaning is disputed must thus answer a simple question: 'is the insurer's interpretation of the contract the only reasonable and fair construction as a matter of law?'"  *U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, No. 12 Civ. 6811 (CM), 2014 WL 2199428, at *8 (S.D.N.Y. May 23, 2014) (quoting *Vargas v. Ins. Co. of N. Am.*, 651 F.2d 838, 840 (2d Cir. 1981)).

> b.    *Application*

HCC argues that the Policy, as reformed, unambiguously requires the deduction from Roc Nation's loss all post-death revenue attributable to CAM.  Its argument is based on the text of the Policy, which defines Direct Ascertained Net Loss as Roc Nation's loss under the Purchase Agreement "after subtracting all revenue and other value generated as the result of and/or during the time services were performed by" Feldstein.  Policy at 10.  Emphasizing what it asserts to be a disjunctive "and/or" in that definition, HCC argues that any such revenue or value need only to have been "the result of" Feldstein's services, and that it is irrelevant that most sums it seeks to subtract were not generated until after his death.  Thus, HCC contends, any revenue that is "tied in some way to" Feldstein's work while he was alive must count against Roc Nation's loss.  Def. Mem. at 23.

Roc Nation's position is that the only revenue that qualifies for subtraction is revenue that it actually received from CAM before Feldstein's death.  It argues that the Direct Ascertained Net Loss definition, standing alone, does not supply an unambiguous methodology for calculating the Policy's coverage.  To find such a determinable methodology, it looks instead to the Purchase Agreement between CAM and Roc Nation, which is incorporated by reference into, and gave rise to, the Policy.  In that agreement, Roc Nation emphasizes, Feldstein and Roc Nation agreed to obtain insurance specifically covering the amount Roc Nation paid for its shares of CAM, less dividend distributions Roc Nation had actually received at the time of Feldstein's

death.  Purchase Agreement § 5.2.  And, to the extent the Policy might be found ambiguous even

considering the terms of the incorporated Purchase Agreement, Roc Nation argues that extrinsic

evidence and the *contra proferentem* canon resolve any such ambiguity in its favor.  Thus, Roc

Nation argues, the Policy requires payment of the full coverage amount—$12,529,222—reduced

only by dividends that it had actually received from CAM when Feldstein died.

On this central question, the Court holds largely with Roc Nation.  Even after correcting

the errors in the Policy, which is far from a model of draftsmanship, the Policy's definition of

Direct Ascertained Net Loss, considered alone, does not yield the clear, unambiguous meaning

that HCC attributes to it.  However, when considered in light of the parties' entire agreement—

*i.e.*, the integrated contract that incorporates the Purchase Agreement—that definition's

ambiguity disappears, revealing that Roc Nation's interpretation is, for the most part, correct.

And, to the extent that any ambiguity remains after considering the agreement as a whole,

extrinsic evidence regarding the parties' course of dealing in negotiating the Policy, and the

*contra proferentem* interpretive canon, further reinforce that conclusion.

HCC's arguments for why the definition of Direct Ascertained Net Loss, standing alone,

unambiguously support its position are unpersuasive.  First, HCC declares, with little explanation,

that the word "generated" is "without question forward looking."  HCC Mem. at 23.  Its basis is

*Merriam-Webster*'s definition of the word "Generate," which HCC sets forth as "to bring into

existence," or "to be the cause of."  *Id.* (quoting *Generate*, Merriam-Webster Dictionary (2020),

https://www.merriam-webster.com/dictionary/generate).  But the Policy term is not "generate"—

it is "generated."  Policy at 10.  That word may be susceptible to meaning "revenue or value that

*will be generated*" or "revenue or value *expected to be generated*," if construed in the future-

perfect tense.  But it can equally—and if anything more naturally—be read to carry a

retrospective meaning: to refer to "revenue that *has been generated*" or "revenue that *was generated*."  There is thus nothing inherently "forward looking" in the Policy's use of the term "generated."  If anything, the Policy's use of "generated" without a forward-looking antecedent such as "will be" or "would be" may tend, at the margin, to support Roc Nation's view that the Direct Ascertained Net Loss term is mainly backward looking, focusing on amounts that, as of an earlier point in time, had been brought into existence.  In all events, the Policy's use of "generated" does not resolve the parties' dispute.

HCC next argues that the Policy language providing for the subtraction of revenue or value produced "as the result of and/or during the time services were provided" by Feldstein captures post-death revenue that is in any way causally connected to Feldstein.  *See* HCC Mem. at 23 ("[T]he clause sets no temporal limit on the receipt of a payment, but only requires that it be tied in some way to Mr. Feldstein and the time when Mr. Feldstein was working.").  Read one way, the Policy's use of the term "and/or" arguably[12] authorizes the subtraction of value

---

[12] With an important caveat:  Courts and commentators alike have remarked upon the confusion and ambiguity that often attends the use of the term "and/or."  *See, e.g.*, *In re Seneca Falls Cent. Sch. Dist.*, 459 N.Y.S.2d 689, 693–94 (Sup. Ct. 1983) ("Long since abhorred by the Courts, the use of the term 'and/or' has been referred to as 'the abominable invention' [and] 'as devoid of meaning as it is incapable of classification by the rules of grammar and syntax.'" (citation omitted)); *see also United States v. Taylor*, 258 F.3d 815, 819 (8th Cir. 2001) (remarking, in context of "unfortunate use of the 'and/or' phrase," that "Strunk and White describe 'and/or' as a 'device, or shortcut, that damages a sentence and often leads to confusion or ambiguity'" (quoting William Strunk, Jr. & E.B. White, The Elements of Style 40 (4th ed. 2000))); Bryan A. Garner, A Dictionary of Modern Legal Usage 56 (2d ed. 1995) ("[A]nd/or has been vilified for most of its life—and rightly so.  The upshot is that the only safe rule to follow is not to use the expression in any legal writing, document, or proceeding, under any circumstances." (citation omitted)); *id.* at 57 (noting that sometimes "and/or" is used to mean "and" alone, sometimes is used to mean "or" alone, but, when used properly, should mean "*x or y or both*").  Thus, although HCC treats "and/or" as simply meaning "or," that reading is not the only plausible one.  Roc Nation does not press this point, but in the Court's assessment the policy's use of this unhelpful locution is an additional problem—apart from those reviewed above and below—with HCC's argument that the plain language of the Direct Ascertained Net Loss definition supports its interpretation.

generated *either* "as the result of" Feldstein's services *or* "during the time" that he performed those services.

But reading the clause that way opens up two further interpretive problems.  First, HCC's reading renders the term "during the time"—which appears within the same clause—superfluous. That language suggests some temporal limit on the revenue that is to be subtracted from Roc Nation's loss.  But HCC's reading expressly rejects any such limit.  In asking that *any* amounts causally traceable to Feldstein's services, even if generated and received long after he died (and undisputedly stopped performing services), be subtracted from Roc Nation's loss, it denies any role for the clause "during the time . . . services were performed" in construing the policy. HCC's interpretation thus conflicts with first principles under New York contract law, requiring that surplusage be avoided where at all possible.  *See Olin Corp. v. OneBeacon Am. Ins. Co.*, 864 F.3d 130, 143 (2d Cir. 2017) (reading that creates surplusage "cannot be countenanced under New York principles of contract interpretation" (brackets omitted) (quoting *In re Viking Pump, Inc.*, 27 N.Y.3d 244, 261 (2016))); *Zurich Am. Ins. Co. v. ABM Indus., Inc.*, 397 F.3d 158, 165 (2d Cir. 2005) ("In interpreting an insurance contract under New York law, a court must strive to 'give meaning to every sentence, clause, and word.'" (quoting *Travelers Cas. & Sur. Co. v. Certain Underwriters at Lloyd's of London*, 96 N.Y.2d 583, 594 (2001))).  On the other hand, reading the definition of Direct Ascertained Net Loss to permit subtractions for amounts only where they were generated *both* "as the result of" Feldstein's services *and* "during the time" he provided them would give meaning to both phrases in that definition, although it would also require neglect of the word "or" in "and/or."  No reading of this opaque sentence is thus entirely satisfying.  But HCC cannot claim that its construction, which rejects any temporal limitation to the calculation of loss, is alone, or the most, textually coherent.

Second, even if HCC's assertion that Direct Ascertained Net Loss is not subject to any temporal limitation were persuasive, that would not mean, as HCC urges, that the Policy requires the subtraction of *all* post-death revenue that Roc Nation received from CAM, or artists formerly associated with CAM.  The definition of Direct Ascertained Net Loss undisputedly puts in place a *causal* limitation on the sums to be subtracted from Roc Nation's loss.  *See* HCC Mem. at 23 (acknowledging that Policy "requires that [payments] be tied in some way to Mr. Feldstein and the time when Mr. Feldstein was working").  But at this step of its analysis, HCC abandons all rigor.  It simply assumes that all revenue that Roc Nation received from CAM artists who joined Roc Nation after Feldstein's death, or that Roc Nation received through its negotiation of the Termination Agreement with several third parties, must have been "the result of" Feldstein's services while alive.  *See id.* at 24 ("The services that he rendered during his life may, and have, created results in the form of revenue and other value which was generated after his death.").  As Roc Nation rightly argues, it is not self-evident that all such amounts obtained after Feldstein's death are "the result of" his work.  *See* RN Mem. at 22.  To be sure, to the extent Feldstein generated actual revenue during his lifetime, which at the moment of his death had not yet been disbursed to Roc Nation, such revenue would be causally attributable to his services.  *See infra* pp. 47–48.  But the passage of time and the occurrence of significant post-death events sap the inference of causation as to later-generated amounts.  These events include Roc Nation's acquisition of some, but not all, CAM artists, and its negotiation of a complex Termination Agreement with others.  However the term "as the result of" was meant to apply—a subject on which the Policy does not offer any guidance—HCC's tacit premise that this textual limitation was to be applied without a meaningful inquiry into causation undermines its position.

HCC offers other arguments in support of its reading of the Policy's Direct Ascertained Net Loss term, but none are persuasive. It argues that the Policy's mitigation requirement would be meaningless if Roc Nation's loss were defined only by revenue generated prior to Feldstein's death, because the mitigation requirement by definition could not affect amounts already generated. *See* HCC Mem. at 24; HCC Resp. at 22. That is wrong. As noted, it is possible, as appears to have been the case at the time of Feldstein's death, that his services while alive would have generated actual revenue that had yet to be distributed to Roc Nation. *See* Proof of Loss at 1 (reducing claim because of 2017 CAM revenue "[a]lthough no 2017 cash distributions were made prior to Mr. Feldstein's death"). In these circumstances, the mitigation clause presumably would oblige Roc Nation to proactively seek out such revenue, instead of abandoning such efforts in the knowledge that HCC would compensate it for those sums.

HCC next argues that, absent its interpretation, Roc Nation might reap a windfall from the Policy, by receiving a payout from HCC while obtaining income generated after Feldstein's death that derived from relationships he brought to Roc Nation. This windfall, it argues, would flout general principles of indemnity insurance. *See* HCC Mem. at 8, 21–22, 24. HCC, however, does not cite interpretive authority under which ambiguous text can be rendered clear and concrete under such general principles.[13] And, in any event, its premise that Roc Nation could realize an "undeserved gain" is not compelling. Roc Nation paid to insure its investment

---

[13] HCC relies on a concurring opinion in a 1959 case for the proposition that "[i]ndemnity insurance is not intended to permit an insured an undeserved gain." HCC Mem. at 21–22 (quoting *Federowicz v. Potomac Ins. Co.*, 7 A.D.2d 330, 338 (4th Dep't 1959) (Williams, J., concurring)). In fact, that concurrence responded to the majority's observation that, under its construction, the insured might be able to recover the full value of his destroyed property even though he was soon likely to be evicted, avoiding any actual financial loss. *See Federowicz*, 7 A.D.2d at 334 (Bastow, J.). The majority's construction, if anything, supports Roc Nation's position that the possibility of future income traceable to its association with Feldstein does not make payment under an indemnity insurance policy an unearned windfall.

in CAM against the possibility that Feldstein—its founder and main, if not only, business generator—would become unable to work.  When that happened, it sought payment under the policy from HCC for the amounts it had invested to acquire its share of CAM but had yet to recoup.  As of the moment of Feldstein's death, it was unknown whether, or to what degree, Roc Nation would continue to reap benefits from its association with Feldstein.  As it happens, during the ensuing three years, while HCC investigated and then denied Roc Nation's claim, Roc Nation appears to have salvaged some income from CAM-related sources, while also apparently losing out on substantial revenue that it might have garnered had Feldstein lived.  *See* JSF ¶ 4.  But at the moment of Feldstein's death and soon thereafter, the impact of his passing on Roc Nation's future revenues was unknowable, and the policy served to assure Roc Nation that it would at least recoup its investment.  That Roc Nation appears to have managed to retain certain relationships over the longer term does not make its receipt of insurance coverage aimed at avoiding a loss on the money it spent to purchase its interest in CAM an unearned windfall.

For all these reasons, HCC's interpretation of the Policy's definition of Direct Ascertained Net Loss is not, by any means, inexorably correct.  It is defensible, but not dictated by the Policy text.  Roc Nation, forthrightly, admits that the Direct Ascertained Net Loss definition does not unambiguously command its reading of the contract as a whole.  And rightly so.  Although Roc Nation's position fits somewhat more neatly with the Policy's use of the past-tense word "generated," gives meaning to the Policy phrase "during the time," and presents a more reasonably tailored understanding of what qualifies as "the result of" Feldstein's services, it, too, is imperfect.  It would read the term "and/or" simply to mean "and," and does not otherwise identify a clear textual basis for excluding all amounts genuinely attributable to Feldstein's services but arising after his death.

A fair assessment of the Direct Ascertained Net Loss definition—standing alone—is thus that, on its face, it is ambiguous.  But, contrary to HCC's position, the Court need not take such a myopic approach in assessing the best reading of the Policy.  Turning beyond the text of that definition, to the integrated Policy agreement as a whole, the ambiguity of that definition is readily—indeed easily—resolved.  The Purchase Agreement between Feldstein and Roc Nation, which is expressly incorporated into the Policy, and specifically referenced in the Direct Ascertained Net Loss definition, provides a clear approach—consistent with the Policy text—for calculating Roc Nation's loss.

"When determining whether a contract is ambiguous, it is important for the court to read the integrated agreement as a whole."  *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (citation omitted); *see Olin Corp.*, 704 F.3d at 99.  Under New York law, an integrated written agreement includes documents that it expressly incorporates by reference, which are not considered extrinsic evidence of the agreement's meaning.  *See VFS Fin. v. Ins. Servs. Corp.*, 111 A.D.3d 505, 505–06 (1st Dep't 2013); *McNamee Constr. Corp. v. City of New Rochelle*, 29 A.D.3d 544, 545 (2d Dep't 2006).

Here, the Policy expressly incorporates the Purchase Agreement.  *See* Policy at 9 ("The proposal form, together with all other documents and information provided by the **Insured**, or on their behalf in support of the proposal, forms the basis of and is incorporated into this insurance."); *id.* at 21 ("The specific contract referred to in this policy is the Purchase Agreement entered into as of the 14th day of September, 2016, by and among Career Artist Management, Jordan Feldstein, and Roc Nation."); *id.* at 10 ("**Specific Contract** means the formal contract between [Roc Nation] and [Feldstein], in which [Feldstein] agrees to deliver services or to carry out agreed provisions.").  Indeed, the definition of Direct Ascertained Net Loss also explicitly refers to the

Purchase Agreement.  *See id.* at 10 (defining term as Roc Nation's "loss under the **Specific Contract**" after making certain subtractions).  The Purchase Agreement thus forms an integral part of the parties' integrated written agreement, and is properly consulted in construing the Policy's terms.  *Olin Corp.*, 704 F.3d at 99; *See, e.g.*, *Kurz v. United States*, 254 F.2d 811, 812 (2d Cir. 1958) ("[I]t is both good sense and good law that these closely integrated" documents be construed together).

Attempting to avoid use of the Purchase Agreement to construe the term Direct Ascertained Net Loss, HCC argues that the only reason the Policy refers to the Purchase Agreement was as "justification for the sum insured," *i.e.*, as the Policy's "basis."  *See* HCC Resp. at 13–16.[14]  That argument is specious, and contradicts the Policy's clear terms.  Besides identifying the Purchase Agreement as the Policy's "basis," *see* Policy at 9, the Policy also states that the Purchase Agreement is "incorporated into this insurance," and refers to that agreement throughout.  *See, e.g.*, *id.* at 9–10, 21.  In fact, the Direct Ascertained Net Loss definition itself refers to the Purchase Agreement's terms, stating that the Direct Ascertained Net Loss is the amount that Roc Nation "incurs as a loss *under the [Purchase Agreement]*."  *Id.* at 10 (emphasis added).  HCC does not supply any authority for the proposition that a document expressly incorporated into an insurance contract can be ignored when interpreting the central provision of the policy, merely because the document was the impetus to obtain coverage, and the insurer also consulted it in justifying the sum to be insured.

---

[14] HCC states that the "basis" of the insurance contract provides only a record of what the insurer relied on in agreeing to provide coverage, to allow the insurer to understand what it is covering and rescind an agreement if representations therein proved to be untrue.  HCC Resp. at 14.  It also offers extrinsic testimony as to HCC's understanding on this point.  *See* HCC Resp. at 15–16.  But given the Policy's clear incorporation of the Purchase Agreement for purposes other than as the mere basis for the insurance, consideration of such evidence is not proper in this analysis.  And in any event, other such evidence contradicts HCC's point.  *See infra* note 18.

The Purchase Agreement provides critical context in understanding the scope of the Policy's coverage.  In section 5.2 of the Purchase Agreement, Feldstein and Roc Nation agreed to obtain an insurance policy that covered at least "the aggregate purchase price paid at such Closing less any Recouped Purchase Price as of such date."  Purchase Agreement § 5.2. "Recouped Purchase Price," in turn, was defined to mean the "amount of distributions actually paid to [Roc Nation] by [CAM]."  *See id.* § 1.1.  The Purchase Agreement thus contains a clear, unambiguous, and readily administrable formula for the insurance coverage that Feldstein and Roc Nation agreed to purchase.  It would equal the amount Roc Nation had paid to Feldstein in exchange for his shares of CAM, less any amounts Roc Nation had recouped in dividend disbursements as a result of its purchased ownership rights at the time Feldstein died.  Although HCC was not a party to the Purchase Agreement, the Policy expressly incorporated the Agreement, and the Agreement in turn expressly contemplated Roc Nation's insurance policy with HCC. And, as discussed, the Policy's text supports the Purchase Agreement's methodology, even if not unambiguously.  *See supra* p. 43.  This provides unusually compelling support for Roc Nation's thesis that its coverage was to be reduced only by amounts generated before Feldstein died, not by future-generated amounts that could be argued to derive from his work and relationships.

Construing section 5.2 of the Purchase Agreement together with the Direct Ascertained Net Loss provision in the Policy, the loss provision's meaning comes into sharp focus.  *See, e.g.*, *Kurz*, 254 F.2d at 812.  The Agreement makes explicit that the parties' central intention in seeking insurance was to ensure that, if Feldstein were to die, Roc Nation would recoup its investment in CAM.  Roc Nation and Feldstein's agreement specifically contemplated doing so by insuring the full amount of that investment less any amounts "actually paid to" Roc Nation at the time of Feldstein's death.  *See* Purchase Agreement §§ 1.1, 5.2.  It is thus apparent that Roc

Nation and Feldstein, in agreeing to seek insurance coverage, were focused on the amounts *already* generated by Feldstein at the time of his death—indeed, on those that Roc Nation had actually *received*. Debunking HCC's construction, the Agreement is devoid of reference to revenues that Roc Nation might, at some point after Feldstein's demise, garner.

In the end, of course, the Policy did not entirely parallel the Purchase Agreement's language. Rather, as reviewed above, it covered Roc Nation's investment less "all revenue and other value generated as the result of and/or during the time services were performed by" Feldstein. Policy at 10. This language, if myopically construed, is ambiguous as to the meaning of Direct Ascertained Net Loss. *See supra* pp. 38–43. But it does helpfully shed light on a narrower question: how to treat amounts generated by Feldstein before his death but not yet in Roc Nation's physical custody. Although the Purchase Agreement spoke in terms of Roc Nation's actual receipt of payment as of Feldstein's death, the Policy permitted deductions of any amounts "generated" by Feldstein "as the result of and/or during the time" he worked. As Roc Nation suggested to HCC might be the case during HCC's investigation, the Policy is thus clear that amounts generated by Feldstein in 2017, even if they had not been disbursed to Roc Nation by the day Feldstein died, must also be deducted from Roc Nation's loss. *See* Proof of Loss at 1 (deducting "2017 net income attributed to Roc Nation" even though "no 2017 cash distributions were made prior to Mr. Feldstein's death"); Aug. 8 Ltr. at 1. Such a result would not have followed had the Policy copied, verbatim, section 5.2 of the Purchase Agreement. But the Policy instead employed a more expansive definition as to the amounts to be subtracted, which—on this discrete point—is clear. It provided for the subtraction of amounts "generated" by the date of Feldstein's death, even if they had not yet reached Roc Nation's coffers on that date.

The same is not true of amounts generated *after* Feldstein's death, even if they could conceivably be traced to Feldstein, because, for the reasons discussed, the Policy does not clearly require such deductions.  And interpreting the Policy definition's ambiguity on this point to so require would put that definition into conflict with section 5.2 of the Purchase Agreement, apart from opening up hard—if not metaphysical—questions, extending potentially for many years after Feldstein's death, as to the traceability of individual Roc Nation revenue items to his work and relationships.  Such exercise would, further, be antithetical to the goal of ascertainability that the Policy term itself—"Direct *Ascertained* Net Loss"—embeds.

In sum, the Court finds, the Policy, considered as an integrated whole, including the Purchase Agreement that it incorporates, authorizes the deduction of sums that were both (1) the result of services Feldstein performed while he was alive and (2) generated during the time he performed those services.[15]  However, amounts generated by artists who continued to work with Roc Nation after Feldstein's death, or as a result of the Termination Agreement that Roc Nation negotiated, cannot offset Roc Nation's recovery under the Policy.  Those amounts, which were not generated while Feldstein was alive and are causally removed from his work, fall outside the amounts to be subtracted under the definition of Direct Ascertained Net Loss.  Accordingly, the Court will grant Roc Nation's motion for summary judgment as to its interpretation of the Policy, and will deny HCC's, with only the modest departure from Roc Nation's interpretation, noted above, that amounts determinably generated before Feldstein's death but not yet in Roc Nation's physical custody as of December 22, 2017 may be subtracted.

---

[15] Although the summary judgment record, as presented to the Court, does not permit a precise tabulation, the sums properly subtracted from Roc Nation's recovery would appear to include most, if not all, of the 2017 annual dividend distribution that Roc Nation received from CAM in 2018, given Feldstein's death just nine days before the end of that calendar year.

Although not necessary to the Court's determination, the extrinsic evidence offered by the parties strongly reinforces this conclusion.  At the time they negotiated the policies, HCC employees repeatedly confirmed that the Purchase Agreement was central to the meaning of the Policy's coverage.  On October 7, 2016, while reviewing the original, 2016 Policy,[16] Philip Hall, a managing director at TMHCC, wrote to Keoshgerian:  "Thank you for the Purchase Agreement which I have been through in some detail.  Ultimately it seems clear to me that we are covering the limit as stipulated within Section 5.2 (Key Man Insurance) being 'the aggregate purchase price paid at such Closing less any Recouped Purchase Price as of'" Feldstein's death.  JSF ¶ 20.[17]  Keoshgerian similarly testified that he reviewed and considered the Purchase Agreement while negotiating both the 2016 and 2017 policies.  *See* Keoshgerian Tr. at 65 ("I made every effort to try to establish what the insured required from the insurance policies, both 2016 and 2017, which would have included reviewing [the Purchase Agreement].");  *id.* ("I took into account what was written in this Section 5.2 . . . .  So I was trying to provide a policy which I felt provided the . . . appropriate needs on the terms I discussed with the broker.").[18]

---

[16] As HCC has maintained, the record is clear that HCC and Roc Nation intended the Policy to reprise the same terms as the original, 2016 Policy.  *See, e.g.*, JSF ¶¶ 24–26, 40.

[17] Hall continued, stating that he didn't "see any reference to the 'Recouped Purchase Price' further on within the contract," and the record leaves unclear whether he ultimately found the definition of that term on page 7 of the Purchase Agreement.  JSF ¶ 20 ("[C]an you confirm how this is calculated?  Obviously a return from the purchased business – profit from a new division?").  But the Purchase Agreement contained that definition, and the undisputed fact remains that Hall understood section 5.2 of that agreement to provide substantive guidance in interpreting the Policy.  *See id.* (noting that "it's really important to button down this element at inception, rather than getting into a muddle at point of loss").

[18] Keoshgerian's testimony on this point reinforces that HCC looked to the Purchase Agreement both as justification for the sum insured *and* to craft the Policy's substantive coverage terms, in order "to establish what the insured required from the insurance policies."  Keoshgerian Tr. at 64–65.

Attempting to blunt this evidence, HCC contends that other extrinsic evidence supports its position that the parties envisioned a broader pool of subtractions to arrive at Roc Nation's Direct Ascertained Net Loss.  First, it repeatedly claims that Roc Nation's accounting for post-death revenue in its Proof of Loss supports HCC's interpretation.  *See, e.g.*, HCC Mem. at 24; HCC Resp. at 19–20.  But this argument mischaracterizes the methodology Roc Nation used in that document.  There, Roc Nation represented that its loss under the Policy was its investment in CAM, less the 2016 dividends it had received and the 2017 dividends it soon expected to receive. Proof of Loss at 1.  That is largely consistent with its position here, and accords with the interpretation of the Policy that the Court has adopted.  Roc Nation did note that it had expected to recoup its investment in CAM by 2020 had Feldstein lived, and so reduced its loss to present value based on that expected timeline.  *Id.* at 2.  But nowhere did it subtract, as HCC now urges, hypothetical amounts that Roc Nation might later have been able to generate from persons once associated with Feldstein.  Second, HCC contends that Blackman "was aware" that Roc Nation's loss would be reduced by "revenue generated as the result of services provided by Mr. Feldstein."  HCC Mem. at 24 (citing Vogrin Decl., Ex. O ("HCC Blackman Tr.") at 181–82). But Blackman never stated that he understood post-death revenue to count against Roc Nation's claim.  *Id.*  On the contrary, when asked whether he understood that Roc Nation "would need to prove its loss and that . . . any recoupment made on the company post loss would be deducted from the claim," he responded "No."  Finch Decl., Ex. QQ ("RN Blackman Tr.").  Similarly, the fact that Keoshgerian suggested that any actual payment amount would be calculated at the time of loss, *see* JSF App'x, Ex. 24 at 4, does not speak to the methodology for that calculation—only that some amounts would be subtracted from the limit of indemnity at the time of loss.

50

In light of these discussions and the Policy terms at issue, it is clear that the parties' reasonable expectation at the time of contracting was that HCC would cover, broadly speaking, Roc Nation's investment in CAM less amounts Roc Nation had recouped or which had already been generated and which it imminently stood to recoup from CAM at the time of Feldstein's death. Such an understanding would still require an investigation and calculation of the revenue generated at that point, including amounts generated by Feldstein's services that had not yet been distributed to Roc Nation. *See, e.g.*, HCC Blackman Tr. at 181 (testifying that coverage amount was not a "lump-sum payment" and agreeing that "the insured [would] need to prove the financial value of its loss once the claim occurs"). But the Policy, read as an integrated whole and in connection with the parties' contemporaneous communications, does not support allowing HCC to go beyond this, so as to deduct any sum received by Roc Nation, at any point in 2018 or beyond, that could conceivably be traced to Roc Nation's relationship with Feldstein or CAM. Although Roc Nation overstates the case in claiming that a coverage along these lines would be illusory, *see Lend Lease (US) Constr. LMB Inc. v. Zurich Am. Ins. Co.*, 28 N.Y.3d 675, 685 (2017) (an "insurance policy is not illusory if it provides coverage for some acts [subject to] a potentially wide exclusion." (citation omitted)), such a reading departs from the plain meaning of the contract terms, the parties' negotiations over those terms, and the reasonable and ordinary expectations of parties' insuring an investment, like Roc Nation's, in a company like CAM.[19]

---

[19] Although these sources, taken as a whole, yield a clear answer, the Court notes that the *contra proferentem* canon reinforces this result. *See, e.g.*, *Kenavan v. Empire Blue Cross & Blue Shield*, 248 A.D.2d 42, 47 (1st Dep't 1998) ("Since evidence introduced by the parties extrinsic to the policies was not dispositive of the issue, the IAS court also properly relied on the doctrine of *contra preferentum*, under which any ambiguity is liberally construed in favor of the insured and against the insurer."). HCC has not shown that its "interpretation of the contract [is] the only reasonable and fair construction as a matter of law," even when considering extrinsic evidence and other indicia of the parties' intent. *Vargas*, 651 F.2d 838 at 840. It is Roc Nation's position

**CONCLUSION**

For the foregoing reasons, the Court grants Roc Nation's motion for partial summary judgment, subject to the modest limitation reviewed above, and denies HCC's motion for summary judgment.  The Policy, the Court holds, requires HCC to pay Roc Nation its Direct Ascertained Net Loss, which means the $12,529,222 identified in the Policy less amounts generated by Feldstein while he was alive and performing services.  Those amounts include revenue generated by CAM through December 22, 2017, even if not paid to Roc Nation as of that date, but do not include post-death revenue such as from artists formerly associated with Feldstein or CAM.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 170 and 179.

The parties are directed to file a joint letter by March 18, 2021, setting forth their views as to the appropriate next steps in this case.

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: March 4, 2021
New York, New York

---

that is well supported and, by far, the best reading of the Policy, read in light of the incorporated Agreement and the other, extrinsic, evidence.  Accordingly, even if these materials did not yield an unambiguous answer, the Court, based on that canon, would still resolve this matter in favor of Roc Nation, as the insured.